**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 17-20898-CR-MOORE/SIMONTON**

**UNITED STATES OF AMERICA,**

**v.**

**EDWARD J. DIMARIA,**

**Defendant.**
**_______________________________/**

**ORDER DENYING DEFENDANT'S MOTION TO TRANSFER VENUE TO THE SOUTHERN DISTRICT OF NEW YORK**

**This matter arose upon the Defendant's Motion to Transfer Venue to the Southern District of New York, ECF No. [25]. The government has responded in opposition, ECF No. [27], and Defendant has filed a reply, ECF No. [29]. This matter was referred to the undersigned Magistrate Judge by the Honorable K. Michael Moore, Chief United States District Judge, ECF No. [12]. Oral argument on this motion was held on February 14, 2018, ECF No. [34].[1] For the reasons stated below, the Motion is denied.[2]**

---

**[1] A transcript of the hearing has been filed with the Court, ECF No. [36].**

**[2] The Eleventh Circuit has yet to rule on whether a Motion to Transfer Venue should be treated as a dispositive or non-dispositive motion; thus there is no clear precedent as to whether the undersigned should issue an Order pursuant to the magistrate judge's authority or a Report and Recommendation for review by the District Judge. *Compare Dunn & Fenley, LLC v. Diederich,* No. 06-6243-TC, 2010 WL 28662, at *2 (D. Or. Jan. 5, 2010) ("[B]ecause a motion to transfer venue does not address the merits of the case but merely changes the forum of an action, it is a non-dispositive matter that is within the province of a magistrate judge's authority."), *Paoa v. Marati,* No. 07-00370, 2007 WL 4563938 (D. Haw. Dec. 28, 2007) (noting that transfer of venue is a non-dispositive matter), *and Holmes v. TV-3, Inc.,* 141 F.R.D. 697 (W.D. La. 1991), *with Payton v. Saginaw Cty. Jail*, 743 F. Supp. 2d 691, 693 (E.D. Mich. 2010) (addressing split in authority and concluding that "the magistrate judge did not have the authority to enter the order transferring venue"), *Beavers v. Express Jet Holdings., Inc.,* 421 F. Supp. 2d 994 (E.D. Tex. 2005), *and Forest Labs. Inc. v. Cobalt Labs. Inc.,* No. 08-21-GMS-LPS, 2009 WL 605745 (D. Del. Mar. 09, 2009). At the hearing, defense counsel opined that this was a non-dispositive motion that could be decided by an Order; government counsel tentatively opined that this matter should be considered dispositive, ECF No. [36] at 32-35. The undersigned finds those cases that treat a motion to transfer venue as a non-**

## I. BACKGROUND

Defendant is charged in a thirteen-count Indictment with one count for Conspiracy to Make False Statements to a Public Company's Accountants, and to Falsify Books, Records, and Accounts of a Public Company; three counts of False Statements to Accountants; six counts of False Entries in a Public Company's Books, Records, and Accounts; one count of Conspiracy to Commit Securities and Wire Fraud; one count of Wire Fraud; and one count of Securities Fraud pursuant to 18 U.S.C. § 1348. The charges relate to the accounting of Bankrate, Inc. ("Bankrate"), a formerly publicly-traded company engaged in the business of providing consumers with personal finance information on various topics including mortgages, insurance, credit cards, retirement, automobile loans, and taxes. The charges against Defendant span the time period from approximately August of 2011, when Bankrate went public, through approximately 2014, when Defendant separated from Bankrate. Until sometime in 2014, Bankrate's principal executive offices and corporate headquarters, as stated in its filings with the United States Securities and Exchange Commission (the "SEC"), were located in North Palm Beach, Florida; Bankrate also maintained offices in New York, New York; Denver, Colorado; and Austin, Texas.

Defendant served as Bankrate's Chief Financial Officer and a Senior Vice President from 2006 through approximately September 2014. Starting in or around August 2011, Bankrate's stock was publicly traded on the New York Stock Exchange and Bankrate was registered with the SEC. As a public company, Bankrate was required to file annual 10-K reports and quarterly 10-Q reports with the SEC. As Bankrate's CFO,

---

dispositive matter more persuasive, and therefore has entered an Order on the Motion. To the extent that either party contends that the undersigned lacks proper authority to issue an Order on the instant motion, and should the District Judge concur, the undersigned intends that this Order shall be treated as a Report and Recommendation subject to review by the District Judge. The undersigned notes that, pursuant to Eleventh Circuit Rule 3-1, failure to object to this Order will waive the right to challenge on appeal any unobjected to factual and legal conclusions.

**Defendant was responsible for overseeing Bankrate's books and records, and for signing certifications filed with Bankrate's 10-K and 10-Q filings attesting, among other things, that (a) based on his knowledge, Bankrate's reports fairly presented, in all material respects, the financial condition of Bankrate; (b) he had disclosed any fraud, whether or not material, involving management or other employees who had a significant role in Bankrate's internal controls over financial reporting; and (c) based on his knowledge, Bankrate's reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements, in light of the circumstances under which the statements were made, not misleading. In addition to its SEC-required disclosures, Bankrate also disclosed its financial information directly to shareholders and the investing public.**

**The alleged fraud was carried out by utilizing a combination of methods which included maintaining a "cookie jar" or "cushion" of unsupported and unnecessary expense accruals, mischaracterizing certain of Bankrate's routine expenses as "deal costs," making unsupported revenue and earnings adjustments, and lying to Bankrate's auditors and the investing public about Bankrate's true condition. Defendant allegedly directed the fraudulent misrepresentation of Bankrate's financial statements through phone calls or emails to employees in Bankrate's Palm Beach, Denver, and Austin offices. At Defendant's direction, the employees in these offices would then enter doctored bookkeeping entries for revenue that had not been received or expenses that had not been incurred. A "cushion" spreadsheet was maintained in the North Palm Beach corporate headquarters which tracked these doctored bookkeeping entries. Once the "cushion" had been built up through the entry of unsupported revenue and expenses, the fraudulently booked revenue and expenses could then be used to manipulate Bankrate's financial results. Subsequently, additional manipulation would be required to further camouflage the fraudulent bookkeeping practices. These efforts to**

"roll-up" the bookkeeping in order to further conceal the doctored entries and existence of the "cushion" took place in the Bankrate office in North Palm Beach, Florida.

Federal securities laws require that an independent auditor examine and report on the financial statements that a public company's management has prepared. During the relevant time period, Grant Thornton ("Grant Thornton") acted as the independent auditor of Bankrate's financial statements. An auditing team from Grant Thornton met with Bankrate employee's at Bankrate's North Palm Beach headquarters to conduct interim and annual audit reviews. Defendant, and others, signed and submitted Management Representation Letters to Grant Thornton's Fort Lauderdale office, which Grant Thornton relied on when providing its opinions as to whether Bankrate's annual financial statements fairly presented Bankrate's financial position. Grant Thornton's opinions were signed on behalf of its office located in the Southern District of Florida.

In approximately August of 2012, the SEC began an investigation of Bankrate's accounting, focused principally on its financial results for the second quarter of 2012. On September 8, 2015, a civil enforcement complaint was filed in the Southern District of New York against Defendant and Bankrate's Vice President and Director of Accounting Matthew Gamsey, alleging a scheme to artificially inflate revenues and understate expenses in order to meet Bankrate's financial targets. That same day, the SEC announced that it had entered into administrative settlements with Bankrate itself and Hyunjin Lerner. Mr. Lerner had joined Bankrate in 2006 and served as Vice President of Finance until 2015, reporting directly to Defendant. The SEC civil litigation against Defendant and Gamsey continued until the case was settled in 2017 without admission of liability. With regard to the SEC investigation and civil litigation, Defendant was represented by New York counsel.

On March 28, 2017, the government filed a twelve-count Indictment against Mr. Lerner in the Southern District of Florida for Conspiracy to Commit Wire Fraud, Falsify

**Books, Records, and Accounts of a Public Company, and Make False Statements to a Public Company's Accountant, three counts of Wire Fraud, Securities Fraud, four counts of False Entries in a Public Company's Books, Records, and Accounts, and three counts of False Statements to Accountants. On October 12, 2017, Mr. Lerner entered into a cooperation agreement and pleaded guilty to one count of Conspiracy, and on January 11, 2018 he was sentenced by this Court and remanded into custody.**

**On December 19, 2017, the government filed its Indictment against Defendant in the Southern District of Florida, charging him with thirteen counts, including one count for Conspiracy to Make False Statements to a Public Company's Accountants, and to Falsify Books, Records, and Accounts of a Public Company; three counts of False Statements to Accountants; six counts of False Entries in a Public Company's Books, Records, and Accounts; one count of Conspiracy to Commit Securities and Wire Fraud; one count of Wire Fraud; and one count of Securities Fraud pursuant to 18 U.S.C. § 1348.**

## II. FRAMEWORK FOR ANALYSIS

**A motion for change of venue to another district made pursuant to Fed. R. Crim. P. 21(b) is based on an evaluation of "convenience of the parties and the witnesses and [] the interests of justice." In *Platt v. Minnesota Mining & Manufacturing Co*., 376 U.S. 240 (1964), the United States Supreme Court summarized factors that are properly considered by a district court in evaluating a transfer motion, including: the location of the defendants; the location of possible witnesses; the location of events likely to be at issue; the location of documents; potential disruption of a defendant's business; expenses to the parties; location of counsel; relative accessibility of the place of trial; the docket condition of each district involved, and any other special factors which might affect transfer. The relative significance of these factors varies widely from case to case and "[t]he decision of whether to grant [a] motion to transfer under Rule 21 [lies] within the trial court's discretionary authority . . . ." *United States v. Kopituk*, 690 F.2d 1289,**

1322–23 (11th Cir.1982) (citations omitted). A criminal defendant does not have a constitutional right to be tried in the district encompassing his residence. *Platt v. Minnesota Mining and Manufacturing Co*., 376 U.S. 240, 245 (1964).

As the parties' note in their briefing, there is some dispute within this District as to the burden on Defendant. Courts in this District have looked to "the defendant to demonstrate a substantial imbalance of inconvenience to himself . . . ." *United States v. Stickle*, 355 F. Supp. 2d 1317, 1321 (S.D. Fla. 2004) citing *United States v. Sklaroff*, 323 F. Supp. 296, 323–24 (S.D. Fla. 1971). It has also been noted in this District, however, that "'[t]he substantial balance of inconvenience' standard is not found in any binding authority. There are some out-of-circuit cases which use the language, and there are also some district courts in our circuit which also use that standard. But there are other courts which do not adopt the standard." *United States v. Holland*, No. 17-CR-20054, 2017 WL 1433265, *7 (S.D. Fla. 2017).

The undersigned need not determine whether a defendant must establish "substantial imbalance" to support a transfer request, or whether the Court may exercise its discretion to transfer based only on a finding of "convenience" and the interests of justice; Defendant has failed to meet his burden under either standard.

## III. DEFENDANT'S MOTION TO TRANSFER VENUE

Applying the Platt factors laid out above, the undersigned denies the motion because Defendant has failed to sufficiently demonstrate that convenience and the interests of justice warrant transfer of the case to the Southern District of New York. Having considered and balanced the Platt factors, the undersigned concludes that a trial in Miami will best serve the convenience of the parties and witnesses and the interest of justice.

### 1) Location of the Defendant

The Defendant currently resides in Monroe, Connecticut, approximately 65 miles

**outside New York City, with his wife and 14 year-old son, who is still in high school. Defendant additionally has two older children who are currently enrolled or have plans to enroll in college or graduate school, ECF No. [25] at 3. Though Defendant notes that certain elderly relatives residing in the state of New York are not in good health, none of these relatives live in either Monroe, Connecticut or New York City, New York, nor does Defendant represent he bears significant responsibility for their care.**

**Although the Southern District of New York is closer to Defendant's home in Connecticut, Defendant will likely be required to relocate during the trial whether it takes place in New York or Florida. The Court recognizes, however, that relocation to New York is less burdensome than relocation to Miami; and, that daily travel is possible between Connecticut and New York, whereas that would not be realistic between Connecticut and Miami. Notably, though, even if Defendant resided in the Southern District of New York "[a] criminal defendant has no right to be tried in the place of his domicile… and [a] defendant's concerns about the expense and inconvenience of being tried away from home are ordinarily of little relevance to a motion for a change of venue."** ***United States v. Bagnell*****, 679 F.2d 826, 832 (11th Cir. 1982) (citation omitted). Moreover, the trial is not expected to be unduly lengthy, since the estimated length of the trial is only two weeks.**

**Given the length of the trial and the likelihood of relocation whether the trial takes place in New York or Miami, and in the absence of any compelling obligations requiring the Defendant's presence in Monroe, Connecticut where he resides, the first Platt factor weighs only slightly in favor of transfer.**

**2) <u>Location of Possible Witnesses</u>**

**The parties have not yet disclosed the witnesses to be called at trial. Given the overlap between the issues raised in the SEC's investigation and the instant case, however, Defendant argues that the depositions conducted in that investigation are**

**instructive and "provide a clear indication of which district the majority of potential witnesses would find most convenient," ECF No. [29] at 3. Over the course of those proceedings, fifteen fact witnesses were deposed with seven depositions occurring in New York, four depositions in Texas, two depositions in California, and one each in Denver and Florida. Importantly, though, the SEC proceedings were based in the Southern District of New York, so the choice of New York City as a convenient venue for those depositions does not indicate, nor does Defendant suggest, that all seven of the deponents deposed there resided in or near New York City.[3] Without more information, the fact that an earlier deposition for proceedings taking place in the Southern District of New York was conducted in New York City does not necessarily indicate that it would not have been as convenient for those witnesses to travel to Miami for deposition.**

**Defense counsel also notes generally that everyone, both personal and professional, who knows Defendant well resides in New York and that any character witnesses called by the defense will likely be from New York, ECF No. [36] at 15.**

**The government anticipates calling approximately ten to twelve witnesses, with only four of those witnesses to provide substantial testimony. Of the total witnesses, four or five are located in the Southern District of Florida; of those four witnesses anticipated to provide substantial testimony, three are currently located in the Southern District of Florida. The government anticipates that it will call approximately three witnesses located in New York, but only one of these witnesses is expected to provide substantial testimony, ECF No. [36] at 26-27. Additional potential witnesses are located in Texas, Colorado, and California and will have to travel regardless of venue, ECF No. [27] at 7. Mr. Lerner, who was indicted, pleaded guilty, and was sentenced in the Southern District of Florida, has agreed to cooperate in the prosecution of Defendant and**

**[3] Government counsel stated at the hearing that some of the witnesses deposed in New York during the SEC investigation voluntarily came to New York even though they did not reside in New York, ECF No. [36] at 22.**

**is an anticipated trial witness. He is currently detained in the Southern District of Florida, ECF No. [27] at 2-3.**

**Notably, neither side has provided compelling information indicating that any of the anticipated witnesses would be unable to travel to either of the Southern District of Florida or the Southern District of New York.[4] *United States v. Estrada*, 880 F. Supp. 2d 478, 483 (S.D.N.Y. 2012) (finding that location of witnesses in Los Angeles did not favor transfer where the defendant could not identify any specific witnesses that were unable to travel to New York for trial, and explaining the defendant's "minimal showing of inconvenience given the large number of direct airline flights between New York and Los Angeles each day" was counterbalanced by the government's New-York based witnesses); *United States v. Bowdoin*, 770 F. Supp. 2d 133, 139 (D.D.C. 2011) ("The location of witnesses is not dispositive by itself—particularly where, as here, witnesses actually will come from all over.").**

**Thus, given that a significant number of witnesses will be required to travel regardless of venue; neither side has identified any anticipated witnesses that would be unable to travel; it is not clear how many significant substantive defense witnesses reside in New York;[5] and three of the four substantial government witnesses reside in the Southern District of Florida, the second Platt factor weighs slightly against transfer.**

**3) <u>Location of Events Likely to Be at Issue</u>**

**The Government views this case as an accounting fraud case where the center of**

**[4] Although the government has noted a single anticipated witness with potential child care issues should she be required to travel to New York, ECF No. [27] at 8, the undersigned agrees with the Defendant that there is ample time to secure alternative child care if such is necessary.**

**[5] In the Motion to Transfer, Defendant stated that Bankrate Executive 1 and Bankrate Executive 2 (as defined in the Indictment) worked at Bankrate's offices in New York and were likely to be trial witnesses, ECF No. [25] at 3. In addition, the motion refers generally to "additional executives" who worked with Defendant and may be witnesses; and Defendant also noted at oral argument that potential character witnesses reside in the greater New York City area.**

**the fraudulent activity was in the Southern District of Florida, ECF No. [36] at 19-20; the Defendant contends that, to the extent Defendant is alleged to have directed the scheme through communications sent from his office in New York City to his employees elsewhere around the country, New York is the nerve center of the purported conspiracy, ECF No. [25] at 9-10. The Court rejects Defendant's contention that "New York is the [] most significant location with respect to the trial venue," ECF No. [25] at 10. Although Defendant's office was located in Manhattan, Defendant communicated from there with Bankrate employees located in Texas, Florida, and Colorado who carried out his instructions in those districts. The "cushion" spreadsheet, which Defendant controlled through his employees, was maintained in the Southern District of Florida and the "rolling up" of the affected accounts to cover up evidence of the fraud occurred in the Bankrate main office in North Palm Beach, Florida. Moreover, the public company auditors who reviewed and certified the allegedly fraudulent records and Management Representation Letters did so primarily from their offices in the Southern District of Florida, and the deliberate misrepresentations made to the auditors are a key part of the fraudulent scheme alleged by the government.**

**Additionally, it is significant that Bankrate's headquarters and principal executive offices, as reflected on its SEC filings, were in the Southern District of Florida during the relevant time period.**

**Therefore, this District has a strong interest in local resolution of this case and the third Platt factor weighs against transfer of the case.**

**4) <u>Location of Documents</u>**

**It is the undersigned's understanding that the vast majority of the documents and information relevant to this case are already in digital format and have been exchanged electronically. In any event, given the ease of transfer of large volumes of information in today's digital world, this factor is something of a relic. *See, e.g., Ivax Corp. v. B. Braun***

***of America, Inc.,*** **2001 WL 253253, *2 (S.D. Fla. 2001) ("In the real world of computerization and electronic transfer of information, the assemblage of accounting data can be accomplished as easily in Miami, Florida as elsewhere.").**

**Accordingly, this factor is neutral.**

**5) Potential Disruption of Defendant's Business**

**Defendant separated from Bankrate in 2014 and is not currently employed. Although Defendant does engage in some consulting work, real estate investing, and volunteering at his church, ECF No. [25] at 7, n.2, disruption of these recreational and part-time activities does not warrant transfer of the case. Moreover, given that Defendant does not reside in New York City, the disruption of these activities is likely to occur regardless of whether the trial occurs in the Southern District of Florida or the Southern District of New York.** ***See United States v. Farkas*****, No. 1:10-CR-200, 2010 WL 3835110, at *5 (E.D. Va. Sept. 24, 2010) (finding factor did not support transfer because 'any criminal trial would disrupt [the defendant's] work, regardless of the location of the trial.")**

**Thus, the fifth Platt factor is neutral.**

**6) Expenses to the Parties**

**Defendant does not claim that the expense of trial in Miami will cause him financial hardship, nor does he rebut the government's assertion that he cannot claim such hardship due to his financial resources, ECF No. [27] at 10. Moreover, Defendant does not reside in New York City and will likely have to travel and obtain temporary lodging regardless of whether the trial was to occur in Miami or New York City. And, as noted by the government, according to the U.S. General Services Administration, the per-diem lodging rates for New York City are twice as much as for Miami in the month of June 2018, when Defendant's trial is currently set to take place.[6] Any savings the**

**[6] The General Services Administration sets per diem rates for each U.S. city and state each year. The GSA rate table was originally designed and primarily applies to federal**

**Defendant might hope for by avoiding the need for quite as many hotel rooms would be, at least partially, defrayed by the added costs of lodging and other expenses in New York City.**

**The government, too, will incur travel and lodging expenses whether the trial occurs in Miami or New York City. Given the per diem rates for both cities, however, the government's expenses will be less in the Southern District of Florida.**

**Thus, the sixth Platt factor is neutral.**

**7) Location of Counsel**

**Defendant retained counsel in New York during the earlier SEC investigation and civil lawsuit. The parties do not dispute that there is substantial overlap between the issues and claims addressed in the SEC proceedings and those addressed herein, though the SEC proceedings and criminal investigation differ in scope and focus, ECF No. [36] at 53. Thus, the factual knowledge developed by Defendant's counsel during the SEC proceedings will be, to some extent, applicable in the criminal proceedings. Defendant has only recently hired local counsel in the Southern District of Florida, but would not need to retain this additional counsel if the case were transferred to the Southern District of New York.**

**While it is certainly not the case that "competent and experienced counsel cannot be found in this district,"** ***United States v. Lindh*****, 212 F. Supp. 2d 541, 552 (E.D. Va. 2002), Defendant should not be faulted for selecting New York-based counsel three years ago and for desiring to keep the same counsel for his defense in a matter with substantial similarity.** ***See United States v. Russell*****, 582 F. Supp. 660, 663-64 (S.D.N.Y. 1984)**

---

**employees, but many private employers also utilize the GSA rates and the IRS uses it to determine the taxability of daily travel budgets provided to private employees. For the month of June 2018, in which this trial is anticipated to take place, the Daily Per Diem Rate for lodging is $119 in Miami and $253 in New York City. Per Diem Rates, U.S. General Services Administration (February 27, 2018), https://www.gsa.gov/travel/plan-book/per-diem-rates.**

(granting motion to transfer criminal prosecution from New York to Memphis and noting that the investigation began three years earlier in Memphis, when the defendants were represented by Memphis counsel). However, given the advanced travel and communication technology of today, any inconvenience brought about by the location of counsel can be largely allayed if sufficient financial resources are available. As previously noted, Defendant has not claimed that he will suffer financial hardship should the trial take place in the Southern District of Florida and there are a multitude of flights between New York and Miami every day. Additionally, Defendant's New York-based counsel have already been admitted *pro hac vice* to the Southern District of Florida and will be able to represent him fully in this case, ECF Nos. [18], [19].

The government is primarily represented by attorneys located in Washington, D.C. and forfeiture counsel in the Southern District of Florida has recently joined the case. The government's Washington, D.C.-based attorneys will have to travel regardless of venue.

The seventh Platt factor thus weighs slightly in favor of transfer.

8) <u>Relative Accessibility of the Place of Trial</u>

The Southern District of Florida, with its numerous airports, including Miami International Airport, Fort-Lauderdale Hollywood International Airport, and Palm Beach International Airport, is, like the Southern District of New York, a major transportation hub. *See, e.g. Estrada*, 880 F. Supp. 2d at 484 (finding major hubs to be equally accessible as "'the efficiency of modern air transportation' attenuates accessibility concerns" (quoting *United States v. U.S. Steel Corp*., 233 F. Supp. 154, 158 (S.D.N.Y. 1964))).

Accordingly, this factor is neutral.

9) <u>Docket Condition of the Relevant Districts</u>

For the year ending December 30, 2017, the most recent statistics currently

**available, there were 616 pending cases per judge in the Southern District of New York and only 358 pending cases per judge in the Southern District of Florida. The average time from filing to disposition in a criminal case in the Southern District of New York is 14 months, compared with only 5.5 months in the Southern District of Florida.[7] The trial of this case in this District is set for the two-week trial period commencing May 29, 2018, ECF No. [22], and thus will occur promptly. Under these circumstances, in which the Southern District of Florida resolves cases more than twice as quickly as the Southern District of New York, transfer of this case to the Southern District of New York "could result in substantial delay" and "[t]hus, this factor does not support transfer."** ***United States v. Logan*, No. 1:12-CR-506, 2013 WL 1450547, at *4 (E.D. Va. Apr. 4, 2013); *see also United States v. Young*, No. 2:12-CR-502, 2012 WL 5397185, at *6 (explaining that "the relevant statistics are those that indicate whether the district can more easily give the defendant a speedy trial").**

**Therefore, the ninth Platt factor, the docket conditions of the districts involved, weighs against transfer of the case.**

**10) <u>Balancing of the Factors</u>**

**The decision to transfer a case under Rule 21(b) is within the discretionary authority of the trial court.** ***Kopituk*, 690 F.2d at 1322. In many cases, the factors do not uniformly weigh for or against transfer and "[i]t remains for the court to try to strike a balance and determine which factors are of greatest importance."** ***United States v. Stephenson*, 895 F.2d 867, 875 (2d Cir. 1990).**

**Herein, the majority of the factors are neutral and do not weigh for or against transfer. The neutral factors include the location of documents, the potential disruption to Defendant's business, expenses to the parties, and the relative accessibility of the**

---

**[7] ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS, UNITED STATES DISTRICT COURTS – NATIONAL JUDICIAL CASELOAD PROFILE (Dec. 31, 2017), http://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2017.pdf.**

place of trial. Two factors slightly favor transfer of the case to the Southern District of New York, the location of Defendant and the location of counsel, but given Defendant's financial resources and the fact that Defendant's New York counsel have already been admitted *pro hac vice* to represent him in this District, the slight inconvenience associated with these factors is not significant. On the other hand, the factors weighing against transfer include the location of witnesses, the location of the events likely to be at issue, and the docket condition of the relevant districts. Given the scattered nature of the relevant witnesses, the location of witnesses weighs only slightly in favor of transfer. That Defendant is alleged to have directed a fraudulent scheme with its center of activity in the Southern District of Florida, however, weighs heavily against transfer, as do the statistics indicating that this District can more easily give the Defendant a speedy trial. These three factors far outweigh any minimal inconvenience related to the location of Defendant and his counsel in Connecticut and New York, respectively.

## IV. CONCLUSION

In sum, after analyzing the relevant factors and based on the facts of the case, the Court finds that Defendant has failed to demonstrate that transfer of the case to the Southern District of New York would serve "the convenience to the parties. . . and the witnesses, and . . . the interests of justice." Fed. R. Crim. P. 21(b).

Therefore, for the reasons set forth above, it is hereby

ORDERED AND ADJUDGED that the Motion is DENIED.

DONE AND ORDERED in chambers in Miami, Florida, this 6th day of March, 2018.

Andrea M. Simonton
ANDREA M. SIMONTON
CHIEF UNITED STATES MAGISTRATE JUDGE

Copies furnished via CM/ECF to:
The Honorable K. Michael Moore, Chief United States District Judge
All counsel of record