UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. <u>17-20898-CR-KMM(s)</u>
18 U.S.C. § 371
15 U.S.C. § 78m(b)(2),(5)
15 U.S.C. § 78ff(a)
18 U.S.C. § 2
17 C.F.R. § 240.13b2-1,-2
18 U.S.C. § 1349
18 U.S.C. § 1343
18 U.S.C. § 1348
18 U.S.C. § 981(a)(1)(C)



FILED by ____ D.C.

MAY 1 5 2018

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA.   MIAMI

UNITED STATES OF AMERICA,

v.

EDWARD J. DIMARIA,

Defendant.

_____/

## SUPERSEDING INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Superseding Indictment:

### The Defendant, Related Entities, and Individuals

1.      Bankrate, Inc. ("Bankrate") was a marketing and financial publishing company. Bankrate aggregated and published information related to various consumer financial products, including mortgages, credit cards, insurance, and automobile loans.

2.      Bankrate owned and operated a number of websites that allowed potential customers to compare and shop for different financial products. When a potential customer used one of Bankrate's websites and showed interest in a particular financial product, Bankrate passed

the customer's information along to the bank or financial services company that was offering the product. In exchange for providing information about the potential customer to the company offering the financial product, Bankrate received a payment from the company. Bankrate called the information it sold about the potential customer a "lead." Bankrate sold mortgage leads to banks and mortgage originators; insurance leads to regional and national insurance companies; and credit card leads to various credit card originators.

3.      Bankrate also generated revenue by selling financial information, such as average mortgage rates, directly to newspapers or other publishers, and through advertising on its websites.

4.      From 2011 and continuing into 2014, Bankrate's principal executive offices and corporate headquarters were located in North Palm Beach, Florida, within the Southern District of Florida. Bankrate also maintained offices in New York, New York, Denver, Colorado, and Austin, Texas. Bankrate employed approximately 450 people who worked in three primary divisions: (1) a mortgage information business, referred to internally as "Bankrate Core"; (2) "Bankrate Insurance," an insurance information business; and (3) "Bankrate Credit Cards," a credit card information business. Bankrate's mortgage information business was primarily located at Bankrate's corporate headquarters in the Southern District of Florida.

5.      Starting in or around June 2011, Bankrate's stock was traded publicly on the New York Stock Exchange ("NYSE"), a national securities exchange, and Bankrate was registered with the United States Securities and Exchange Commission ("SEC"), an agency of the United States, pursuant to Section 12(b) of the Securities Exchange Act of 1934. Bankrate's stock traded on the NYSE under the ticker symbol "RATE." Bankrate reported that it earned approximately $424 million in total revenue in 2011, and approximately $457 million in total revenue in 2012. During the same period, Bankrate's shares had a market capitalization of approximately $1 billion.

2

6. From in or around 2006 through in or around September 2014, the defendant **EDWARD J. DIMARIA** served as Bankrate's Chief Financial Officer ("CFO") and a Senior Vice President. **DIMARIA** was a certified public accountant ("CPA"), and his principal office was located in New York. As Bankrate's CFO, **DIMARIA** was responsible for overseeing Bankrate's books and records, and for signing and certifying that Bankrate's financial statements filed with the SEC were truthful and accurate.

7. From in or around September 2006 to in or around September 2014, Hyunjin Lerner served as Bankrate's Vice President of Finance. Lerner's principal office was located at Bankrate's corporate headquarters in the Southern District of Florida. As Vice President of Finance, Lerner reported directly to **DIMARIA**, and supervised other employees in the finance department.

8. Bankrate Executive 1 was a high-ranking executive who worked at Bankrate's offices in New York.

9. Bankrate Executive 2 was a Vice President in the finance department who reported directly to **DIMARIA** and worked at Bankrate's offices in New York.

### Bankrate's Financial Regulators and Auditors

#### The Securities and Exchange Commission

10. The SEC is an agency of the United States government charged by law with preserving honest and efficient markets in securities. The federal securities laws, regulations, and rules were designed to ensure that the financial information of publicly traded companies is accurately recorded and disclosed to the investing public. Securities laws, as well as the SEC's regulations and rules for public companies, required that Bankrate and its directors, officers, and employees, among other things, make and keep books, records, and accounts that accurately and

fairly reflected the transactions and disposition of the company's assets, and prohibited the knowing and willful falsification of Bankrate's books, records, or accounts.

11. Bankrate was also required to file annual reports ("SEC Forms 10-K") and quarterly reports ("SEC Forms 10-Q") with the SEC that contained financial statements that accurately and fairly presented the financial condition of Bankrate, as well as other reports that contained information about Bankrate's management, Board of Directors, business operations, and performance. Through these reports, Bankrate disclosed its financial information to the SEC, Bankrate's shareholders, and the investing public.

12. As CFO of Bankrate, **DIMARIA** signed certifications that were filed with Bankrate's SEC Forms 10-K and SEC Forms 10-Q attesting, among other things, that (a) based on his knowledge, Bankrate's reports fairly presented, in all material respects, the financial condition of Bankrate; (b) he had disclosed any fraud, whether or not material, involving management or other employees who had a significant role in Bankrate's internal controls over financial reporting; and (c) based on his knowledge, Bankrate's reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements, in light of the circumstances under which the statements were made, not misleading.

13. In addition to Bankrate's SEC Forms 10-K and SEC Forms 10-Q filed with the SEC, Bankrate also disclosed its financial information to shareholders and the investing public through press releases, earnings calls, and earnings announcements.

Bankrate's Auditors

14. An auditor is an independent certified public accountant who examines the financial statements that a company's management has prepared. Federal securities laws, regulations, and

4

rules required that an independent auditor examine and report on the financial information that Bankrate provided to the SEC and the investing public.

15. From at least in or around 2011 and continuing through 2014, a known public accounting firm ("Accounting Firm A") acted as the independent auditor of Bankrate's financial statements. Accounting Firm A's offices were located in the Southern District of Florida, in Miami and Ft. Lauderdale, Florida, among other places. Accounting Firm A relied on **DIMARIA**, Lerner, and other Bankrate employees to provide truthful and accurate information about Bankrate's internal accounting practices and policies.

16. Accounting Firm A obtained information about Bankrate from **DIMARIA**, Lerner, and others through phone calls, meetings, and via email. In addition, **DIMARIA**, Lerner, and other Bankrate employees provided written assurances and representations to Accounting Firm A ("Management Representation Letter(s)") that, among other things: (1) they had "made available . . . all [f]inancial records and related data;" (2) they "were not aware of any information indicating that an illegal act, or violations or possible violations of any regulations, ha[d] or may have occurred, whether or not perceived to have a material effect on the interim financial statements;" and (3) they had "no knowledge of fraud or suspected fraud affecting the Company involving (a) Management, (b) Employees who have significant roles in internal control, or (c) Others where the fraud could have a material effect on the interim financial statements." **DIMARIA**, Lerner, and others addressed these Management Representation Letters to Accounting Firm A's offices located in the Southern District of Florida.

17. Based in part on representations made by **DIMARIA**, Lerner, and their co-conspirators in Management Representation Letters, and elsewhere, Accounting Firm A would offer an opinion as to whether Bankrate's annual financial statements fairly presented, in all

material respects, Bankrate's financial position. Accounting Firm A's opinion was signed on behalf of Accounting Firm A's offices located in the Southern District of Florida, and the opinion was filed contemporaneously with Bankrate's annual reports to the SEC.

### Bankrate's Expense Accruals

18. Under the relevant accounting rules, on a quarterly and yearly basis, Bankrate was required to make a good faith estimate of the costs to Bankrate associated with certain expenses, such as legal, marketing, and accounting fees, and then reduce Bankrate's earnings by the amount of that estimate. At Bankrate, the amount of this estimate was referred to as an "expense accrual." Any increase in Bankrate's expense accruals caused a decrease in earnings. Conversely, any decrease in Bankrate's expense accruals caused an increase in earnings. **DIMARIA**, Lerner, and other Bankrate employees in the finance department had the responsibility to decide when and whether to increase or decrease Bankrate's expense accruals. Bankrate was required to provide its quarterly and annual expense accrual calculations to Accounting Firm A.

### Bankrate Publicized "Adjusted EPS" and "Adjusted EBITDA" Metrics

19. In addition to quarterly and annual reports that contained, among other things, Bankrate's purported revenue, earnings per share ("EPS"), and earnings before interest, taxes, depreciation, amortization ("EBITDA"), Bankrate also provided investors with "adjusted" earnings calculations which were purportedly adjusted to exclude, among other things, certain identified expenses.

20. Bankrate would claim publicly that when the company reported "Adjusted EPS" and "Adjusted EBITDA" figures, it meant that Bankrate had adjusted these earnings metrics to only exclude "stock based compensation expense, offering and deal related expenses and amortization expense."

6

21. In addition to including adjusted earnings figures in Bankrate's quarterly and annual financial reports, Bankrate also published adjusted earnings figures in regular press releases, and Bankrate's management discussed adjusted earnings figures in calls with stock market analysts and investors. In Bankrate's press releases, Bankrate would describe the adjusted earnings metrics, including Adjusted EPS and Adjusted EBITDA, as having been provided, in part, "to enhance investors' overall understanding of Bankrate's current financial performance and its prospects for the future."

## COUNT 1
### Conspiracy to Make False Statements to a Public Company's Accountants, and to Falsify Books, Records, and Accounts of a Public Company
### (18 U.S.C. § 371)

1. The General Allegations section of this Superseding Indictment is realleged and incorporated by reference as though fully set forth herein.

2. From in or around at least 2011, through in or around September 2014, in Miami-Dade, Broward, and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendant,

### EDWARD J. DIMARIA,

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, and agree with other individuals known and unknown, to commit certain offenses against the United States, namely:

a. to knowingly and willfully, directly and indirectly (a) make and cause to be made materially false and misleading statements to Accounting Firm A, and omit to state, and cause another person to omit to state, any material fact to Accounting Firm A necessary in order to make statements made, in light of the circumstances under which such statements were made,

7

not misleading, in connection with Accounting Firm A's reviews and audits of Bankrate's financial statements and preparation of Bankrate's quarterly and annual reports required to be filed with the SEC; and (b) take action to coerce, manipulate, mislead, and fraudulently influence Accounting Firm A knowing that such action, if successful, could result in rendering Bankrate's financial statements materially misleading, while Accounting Firm A was engaged in performing reviews and audits of Bankrate's financial statements and preparation of Bankrate's quarterly and annual reports required to be filed with the SEC, in violation of Title 15, United States Code, Section 78ff, and Title 17, Code of Federal Regulations, Sections 240.13b2-2(a) and 240.13b2-2(b); and,

b. to knowingly and willfully falsify, and cause to be falsified, books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of Bankrate, in violation of Title 15, United States Code, Sections 78m(b)(2), 78m(b)(5), and 78ff, and Title 17, Code of Federal Regulations, Sections 240.13b2-1.

## Purpose of the Conspiracy

3. The purpose of the conspiracy was for **DIMARIA**, Lerner, and their co-conspirators to mislead Bankrate's independent auditors, shareholders, regulators, and the investing public about Bankrate's true financial condition in order to: (a) maintain and increase the market price of Bankrate's stock; and (b) unjustly enrich **DIMARIA**, Lerner, and their co-conspirators through the continued receipt of compensation, stock, and other benefits.

## Manner and Means of the Conspiracy

### Overview of the Conspiracy

4. From in or around at least 2011, through in or around September 2014, **DIMARIA**, Lerner, and their co-conspirators agreed to (a) defraud Bankrate's shareholders and the investing public, and (b) mislead Bankrate's independent auditors and regulators by making and causing

others to make false and misleading statements about Bankrate's financial condition. As described below, **DIMARIA**, Lerner, and their co-conspirators utilized a combination of methods to fraudulently manipulate Bankrate's publicly reported revenue and earnings. These methods included maintaining a "cushion" of unsupported and unnecessary expense accruals, mischaracterizing certain of Bankrate's routine expenses as "deal costs," making unsupported revenue and earnings adjustments, and lying to Bankrate's auditors and the investing public about Bankrate's true financial condition.

5.    **DIMARIA** generally directed the fraudulent manipulation of Bankrate's financial statements through interstate telephone calls and emails to Lerner and others at Bankrate's corporate headquarters in the Southern District of Florida.

Manipulating Bankrate's Earnings Through Cookie Jar or "Cushion" Accounting

6.    **DIMARIA**, Lerner, and their co-conspirators used Bankrate's expense accruals to fraudulently manipulate Bankrate's reported earnings through a prohibited accounting practice sometimes known as cookie-jar accounting.

7.    First, **DIMARIA**, Lerner, and their co-conspirators would create a cookie jar of unnecessary and unsupported expense accruals in quarters when they deemed Bankrate's financial performance to be satisfactory. **DIMARIA**, Lerner, and their co-conspirators kept track of the cookie jar on a spreadsheet they referred to internally as the "cushion," or "Ed's cushion." **DIMARIA**, Lerner, and their co-conspirators would create the cookie jar or "cushion" either by (a) refusing to reverse existing expense accruals that had become unsupported, or (b) creating new or inflating existing expense accruals that were baseless. By creating such a cookie jar or "cushion" of unnecessary expense accruals, **DIMARIA**, Lerner, and their co-conspirators lowered Bankrate's earnings in that period by fraudulently booking or maintaining hundreds of thousands

of dollars in expenses that did not exist. **DIMARIA**, Lerner, and their co-conspirators maintained the "cushion" spreadsheet at Bankrate's corporate headquarters in the Southern District of Florida.

8. Second, in periods when they deemed Bankrate's financial performance to be unsatisfactory, **DIMARIA**, Lerner, and their co-conspirators used the cookie jar or "cushion" they had created to fraudulently increase Bankrate's reported earnings by selectively reversing hundreds of thousands of dollars in expense accruals off the "cushion" spreadsheet.

9. For example, in or around April 2012, while Bankrate was preparing its financial statements for the First Quarter, and after the "cushion" had been built up for use in later periods, **DIMARIA** told Lerner via an interstate wire that he "need[ed] all the accrual overage" because he "need[ed] to tune the numbers up closer to \$38 [million in reported earnings]." Lerner responded by attaching an updated version of the "cushion" spreadsheet which showed that there was \$1.7 million in the cookie jar available to reverse and inflate Bankrate's earnings. After receiving the "cushion" spreadsheet, **DIMARIA**, Lerner, and their co-conspirators immediately reversed approximately \$530,000 in accruals that were identified on the spreadsheet as "cushion." In total, before Bankrate filed its financial statements for the First Quarter of 2012, **DIMARIA**, Lerner, and their co-conspirators reversed more than \$1 million in expense accruals which they had previously booked and identified as "cushion," and thereby caused Bankrate to fraudulently report inflated earnings to shareholders and the investing public.

Manipulating Bankrate's Accrued Deal Costs Account and Publicly Reported Adjusted Earnings

10. As described above, Bankrate represented to the investing public that when it reported adjusted earnings figures, such as Adjusted EPS and Adjusted EBITDA, these figures were only adjusted by excluding certain expenses, which Bankrate identified as "stock based compensation expense, offering and deal related expenses and amortization expense." Bankrate's

10

"accrued deal costs" account was an account that purportedly tracked the non-routine expenses which were excluded from Bankrate's Adjusted EBITDA and Adjusted EPS figures.   In reality, **DIMARIA**, Lerner, and their co-conspirators used Bankrate's "accrued deal costs" account to fraudulently increase Bankrate's publicly reported earnings and adjusted earnings figures.

11.     First, **DIMARIA**, Lerner, and their co-conspirators would direct Bankrate's finance department to improperly book routine expenses, unrelated to deals, in the "accrued deal costs" account.  By intentionally adding routine expenses to the "accrued deal costs" account, **DIMARIA**, Lerner, and their co-conspirators caused more expenses to be excluded from Bankrate's publicly reported adjusted earnings figures than was disclosed to investors, and caused Bankrate's publicly reported adjusted earnings figures to be fraudulently inflated.

12.     Second, **DIMARIA**, Lerner, and their co-conspirators hid hundreds of thousands of dollars of "cushion" in Bankrate's "accrued deal costs" account, and used the "cushion" in the "accrued deal costs" account to fraudulently eliminate or reduce the impact of expenses on Bankrate's reported earnings.

13.     For example, on or about March 9, 2012, **DIMARIA** and Lerner received a summary of invoices from Accounting Firm A.  Upon receipt of the summary, which included outstanding audit fees that were unrelated to deals, and knowing that **DIMARIA**, Lerner, and their co-conspirators had built up hundreds of thousands of dollars in "cushion" in Bankrate's "accrued deal costs" account, **DIMARIA** sent the following instructions to Lerner in an email: "Charge ALL THEIR BILLS TO ACCRUED DEAL COST – I DON'T CARE IF THEY COMPLAIN, WE CAN SAY IT WAS A MISTAKE."  When **DIMARIA** sent the email, Bankrate's finance department had already booked more than $100,000 worth of Accounting Firm A's invoices to Bankrate's "accrued deal costs" account, which allowed Bankrate to both fraudulently avoid

11

recognizing an expense in that quarter, and also inflate Bankrate's adjusted earnings. Later the same day, Lerner forwarded **DIMARIA's** email to Bankrate Executive 2 writing "Another Ed special. Don't send this email to Ed or mention I told you."

### Manipulating Bankrate's Financial Statements Through Improper Revenue and Expense Adjustments

14.     Throughout 2011 and 2012, **DIMARIA**, Lerner, and their co-conspirators manipulated Bankrate's financial statements by making a series of false and misleading entries and adjustments to Bankrate's revenue and expense accounts. Often these entries were made by **DIMARIA**, Lerner, and their co-conspirators as Bankrate was in the midst of preparing its quarterly financial statements, and for the purpose of meeting or exceeding a revenue or earnings target.

15.     For example, in or around July 2011 in the midst of preparing Bankrate's first publicly reported quarterly financial statements, **DIMARIA** stated that he "may want to tune our numbers to $30 [million] even ebitda." Lerner responded that it was "no problem getting to $30 million," and suggested that they simply reduce a previously booked expense by $150,000 for no other reason than "to get there." **DIMARIA** responded to Lerner "Ok go ahead – make it just over $30 [million]."

16.     Similarly, in or around June 2012, **DIMARIA** told Lerner to make an improper and unsupported adjustment to a financial report that was being prepared for Bankrate's Board of Directors, and to "keep it under the radar please." Lerner responded by agreeing to make the adjustment.

17.     In addition, in or around July 2012, after reviewing Bankrate's quarterly financial results, **DIMARIA**, Lerner, and their co-conspirators improperly booked hundreds of thousands of dollars in revenue. After finding out about some of the improper entries, Bankrate Executive 2

wrote Lerner that he had just spoken to **DIMARIA**, and "I f***ing knew he was going to do something like this. We need to be very careful how this gets reflected or be able to have some basis for the estimate to show [Accounting Firm A] if they happen to figure it out."

18.     Also in or around July 2012, accounting personnel at Bankrate's Credit Card division refused **DIMARIA's** order to book approximately $300,000 in additional revenue because they believed it was improper under the accounting rules. After learning from Lerner that these lower-level accountants had refused to increase Bankrate's revenue by $300,000, **DIMARIA** responded to Lerner "[w]e will book more, need a list of all reporting issues historically, we can book it on [Bankrate's Mortgage division]." Thereafter, Lerner carried out **DIMARIA's** directive and booked the $300,000 that the lower-level accountants in Bankrate's Credit Card division had refused to book on Bankrate's Mortgage division books.

<u>Concealing False and Misleading Entries from Bankrate's Auditors</u>

19.     First, because cookie jar or "cushion" accounting is prohibited under the accounting rules, **DIMARIA** directed Lerner and their co-conspirators to hide the existence and use of the "cushion" spreadsheet from Bankrate's independent accountants, including Accounting Firm A.

20.     For example, in or around February 2011, Lerner sent an email to **DIMARIA** and others with the subject "First cushion found by [Accounting Firm A]." In the email, Lerner indicated that he had explained falsely the "cushion" to Accounting Firm A as being supported by expected legal fees for which Bankrate had yet to receive a bill. Starting in or around 2011, later versions of the "cushion" spreadsheet sent and received by Lerner and his co-conspirators contained an additional column titled "[Accounting Firm A] Identified," which **DIMARIA**, Lerner, and their co-conspirators used to keep track of "cushion" that had been discovered by Accounting Firm A.

13

21.     In or around March 2011, after Lerner sent **DIMARIA** a version of the "cushion" spreadsheet, **DIMARIA** told Lerner that he was concerned that some of the comments in a version of the spreadsheet might alert Accounting Firm A that the expense accruals were unsupported and in fact "cushion," and chastised Lerner that "[p]eople really have to start using their brains, sometimes I really wonder.  OK why not just write 'Hey [Accounting Firm A] – this entry is cushion, please propose an adjusting entry,'" and that he "really expect[ed] this stuff to be managed better."  Lerner responded by assuring **DIMARIA** that the "schedule was never shared with [Accounting Firm A]" and that it was "purely an internal document."

22.     In or around January 2012, Lerner and **DIMARIA** received an updated analysis of the "cushion" schedule which showed that Bankrate had approximately $1.5 million available in overaccruals in the "accrued deal costs" portion of the cookie jar.  Shortly after receiving the analysis, **DIMARIA** decided to reverse approximately $800,000 in "cushion" from Bankrate's "accrued deal costs" account, which left approximately $700,000 in accrued deal cost "cushion" available for use in later periods.  Lerner then sent a version of the spreadsheet to Accounting Firm A which made it appear that there were only $800,000 in unsupported expense accruals in Bankrate's "accrued deals costs" account, and that all $800,000 had been reversed.  Approximately one week later, Lerner sent a co-conspirator an email with the subject "Ed's Cushion – Save this Email – Don't Share this with Anyone," and attached to the email a spreadsheet itemizing the $700,000 in remaining "cushion" in Bankrate's "accrued deal costs" account that had been concealed from Accounting Firm A.

23.     In or around July 2012, Bankrate Executive 2 emailed Lerner that he believed Accounting Firm A was going to "ding us on accrued deal costs this time" because "the amount is not supported since the balance is entirely cushion."  To avoid revealing the existence of the

"cushion" that **DIMARIA**, Lerner, and their co-conspirators maintained, Bankrate Executive 2 told Lerner he was "not going to give [Accounting Firm A] the accrual rollforward analysis and see if they ask for it to try to avoid the issue."

24.    Second, **DIMARIA**, Lerner, and their co-conspirators made false and misleading representations to Accounting Firm A in written letters, emails, and during conversations with individual auditors.

25.    For example, in or around October 2011, **DIMARIA**, Lerner and their co-conspirators misled Accounting Firm A about the structure of Bankrate's Management Incentive Plan ("MIP"). Under the MIP schedule that had been approved by Bankrate's Board of Directors, employee bonuses were calculated based on how each of Bankrate's three divisions performed against their forecasted EBIDTA. To conceal from Accounting Firm A that Bankrate had adopted a MIP schedule that was based on individual division performance, **DIMARIA** and Lerner directed their co-conspirators to create a fraudulent MIP expense schedule to provide Accounting Firm A.

26.    And in or around May 2012, and again in or around August 2012, **DIMARIA**, Lerner, and their co-conspirators falsely assured Accounting Firm A in connection with the preparation of Bankrate's financial statements that, among other things, they:  (1) had "made available . . . all [f]inancial records and related data;" (2) "were not aware of any information indicating that an illegal act, or violations or possible violations of any regulations, ha[d] or may have occurred, whether or not perceived to have a material effect on the interim financial statements;" and (3) had "no knowledge of fraud or suspected fraud affecting the Company involving (a) Management, (b) Employees who have significant roles in internal control, or (c) Others where the fraud could have a material effect on the interim financial statements."

15

### Selling Bankrate Stock While Continuing to Mislead Bankrate's Auditors and The Public About Bankrate's Financial Condition

27.     In or around July 2012, **DIMARIA** and his co-conspirators learned that Bankrate's financial results for the Third Quarter of 2012 would likely be lower than what analysts were estimating because Bankrate's divisions were underperforming.

28.     On or about July 27, 2012, **DIMARIA** emailed Bankrate's investor relations department and others with instructions to try and persuade the analysts following Bankrate's stock to bring their estimates down for the Third Quarter to "mid to upper $120 million [in revenue]."

29.     On or about July 31, 2012, **DIMARIA** emailed Bankrate's investor relations department reiterating his instructions to try and persuade the analysts following Bankrate's stock to bring their estimates for the Third Quarter down "but don't worry them."

30.     On or about August 1, 2012, **DIMARIA** learned from Bankrate's investor relations department that the analysts following Bankrate's stock were not going to lower their estimates to "mid to upper $120 million" in revenue for the Third Quarter, and that the analysts were instead going "to come in the low 130MM range." Bankrate's investor relations department further advised **DIMARIA** that they could not "push" the analysts "more without getting them worried."

31.     On or about August 1, 2012, **DIMARIA** emailed Bankrate Executive 1 writing "Tried to push hard to get [the analysts] down in Q3 – most will be in the low 130's [in revenue] for Q3 I think – we will see – too high but could not get it down further without spooking them. Calls went well now I think maybe we should have widened the range further on the downside to give us more room, damn. Oh well."

16

32.     On or about August 9, August 10, and August 13, 2012, before Bankrate announced its financial results for the Third Quarter of 2012, **DIMARIA** sold a total of approximately 107,177 shares of Bankrate stock, realizing gross proceeds of approximately $2,060,602.00.

33.     On or about October 16, 2012, Bankrate held a preliminary earnings call with the investing public in which **DIMARIA** and Bankrate Executive 1 revealed that Bankrate's financial results for the Third Quarter were well below analyst estimates. After releasing this news, Bankrate's stock immediately dropped approximately 22 percent.

34.     On or about September 15, 2014, Bankrate announced publicly for the first time that the investing public could no longer rely on Bankrate's previously reported financial statements, and that **DIMARIA** was resigning as Bankrate's CFO. After releasing this news, Bankrate's stock immediately dropped approximately 14 percent.

## OVERT ACTS

In furtherance of the conspiracy and to achieve its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in the Southern District of Florida, and elsewhere, the following overt acts, among others:

35.     On or about March 5, 2011, and immediately after receiving a copy of the "cushion" spreadsheet, **DIMARIA** wrote Lerner that he was concerned that Accounting Firm A might see certain information on the spreadsheet: "People really have to start using their brains, sometimes I really wonder. Ok why not just write 'Hey [Accounting Firm A] - This entry is cushion, please propose an adjusting entry' I really expect this stuff to be managed better." Lerner immediately responded to **DIMARIA** in a separate email, writing "This schedule was never shared with [Accounting Firm A] nor any of the subsidiary schedules from CC or NQ that has these comments.

This is purely an internal document that is only shared between you, [two other Bankrate employees], and myself."

36.     On or about June 29, 2011, **DIMARIA** and Lerner received a copy of the "cushion" spreadsheet from a Bankrate employee that indicated for each individual excess accrual whether or not Accounting Firm A had "identified" the accrual.

37.     On or about October 24, 2011, **DIMARIA** sent Accounting Firm A a misleading analysis that **DIMARIA**, Lerner, and their co-conspirators created to show Bankrate's purported MIP bonus accrual estimate.

38.     On or about November 14, 2011, Bankrate Executive 1 wrote **DIMARIA** proposing to increase certain employee bonuses from $2000 to $2500 "if we have room for it." **DIMARIA** responded indicating it was "no problem" to increase the bonuses because "I have money stashed in a lot of places." Bankrate Executive 1 then responded to **DIMARIA** "cool."

39.     On or about January 27, 2012, Lerner sent an email to Accounting Firm A containing a misleading description of the activity in Bankrate's "accrued deal costs" account.

40.     On or about February 6, 2012, Lerner sent an email to another Bankrate employee attaching the "cushion" spreadsheet with the subject "Ed's Cushion – Save this Email – Don't Share this with Anyone."

41.     On or about March 2, 2012, **DIMARIA** sent Lerner an email asking to review "all our accruals." Lerner responded by asking "You mean our cushion or all our accruals," to which **DIMARIA** replied "Both."

42.     On or about March 9, 2012, **DIMARIA** emailed Lerner the following instructions regarding Accounting Firm A: "Charge ALL THEIR BILLS TO ACCRUED DEAL COST – I DON'T CARE IF THEY COMPLAIN, WE CAN SAY IT WAS A MISTAKE."

43. On or about March 14, 2012, Bankrate Executive 2 asked Lerner to provide a copy of the "cushion" spreadsheet. Lerner responded writing "Sent in a separate email…don't be sharing this with anyone."

44. On or about April 11, 2012, **DIMARIA** sent Lerner an email writing "I need all the accrual overage – I need to tune the numbers up closer to $38 [million in reported earnings]." Lerner responded to **DIMARIA** by attaching the "cushion" spreadsheet and writing "We have $1.7 million + MIP accrual reversal."

45. On or about May 14, 2012, **DIMARIA** and Lerner signed Bankrate's Management Representation Letter addressed to Accounting Firm A's offices in the Southern District of Florida.

46. On or about July 13, 2012, Lerner sent **DIMARIA** an email attaching an updated version of the "cushion" spreadsheet.

47. On or about July 31, 2012, **DIMARIA** and Bankrate Executive 1 held a conference call with the investing public where they discussed Bankrate's financial performance.

48. On or about August 9, 2012, **DIMARIA** sold approximately 79,848 shares of Bankrate stock realizing gross proceeds of approximately $1,541,017.

49. On or about August 10, 2012, **DIMARIA** sold approximately 26,729 shares of Bankrate stock realizing gross proceeds of approximately $508,200.

50. On or about August 13, 2012, **DIMARIA** and Lerner signed Bankrate's Management Representation Letter addressed to Accounting Firm A's offices in the Southern District of Florida.

51. On or about August 28, 2012, Lerner sent **DIMARIA** an email attaching a "cushion" spreadsheet.

52.    On or about March 1, 2013, **DIMARIA** caused Bankrate to file its SEC Form 10-K reporting its financial results for 2012.

All in violation of Title 18, United States Code, Section 371.

### COUNTS 2-4
### False Statements to Accountants
### (17 C.F.R. § 240.13b2-2; 15 U.S.C. § 78ff(a))

1.    The General Allegations section of this Superseding Indictment, as well as the allegations contained in the Purpose of the Conspiracy, Manner and Means of the Conspiracy, and Overt Act paragraphs of Count 1 of this Superseding Indictment, are realleged and incorporated by reference as though fully set forth herein.

2.    From at least in or around 2011, through in or around September 2014, in Miami-Dade, Broward, and Palm Beach Counties, in the Southern District of Florida and elsewhere, the defendant,

### EDWARD J. DIMARIA,

3.    did knowingly and willfully, directly and indirectly (a) make and cause to be made materially false and misleading statements to Accounting Firm A, and omit to state, and cause another person to omit to state, any material fact to Accounting Firm A necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, in connection with Accounting Firm A's reviews and audits of Bankrate's financial statements and preparation of Bankrate's quarterly and annual reports required to be filed with the SEC; and (b) take action to coerce, manipulate, mislead, and fraudulently influence Accounting Firm A knowing that such action, if successful, could result in rendering Bankrate's financial statements materially misleading, while Accounting Firm A was engaged in performing reviews

and audits of Bankrate's financial statements and preparation of Bankrate's quarterly and annual

reports required to be filed with the SEC, as more particularly described below:

| Count | Defendant | Approximate Date | Description of Statement |
|---|---|---|---|
| 2 | **EDWARD J. DIMARIA** | January 27, 2012 | Electronic mail sent from Lerner to Accounting Firm A in the Southern District of Florida containing a false and misleading description of the activity in Bankrate's accrued deal costs account |
| 3 | **EDWARD J. DIMARIA** | May 14, 2012 | Management Representation Letter signed by **DIMARIA**, Lerner, and others, and addressed to Accounting Firm A's offices in the Southern District of Florida |
| 4 | **EDWARD J. DIMARIA** | August 13, 2012 | Management Representation Letter signed by **DIMARIA**, Lerner, and others, and addressed to Accounting Firm A's offices in the Southern District of Florida |

In violation of Title 15, United States Code, Section 78ff, and Title 17, Code of Federal

Regulations, Sections 240.13b2-2(a) and 240.13b2-2(b); and Title 18, United States Code, Section

2.

**COUNTS 5-7**
**False Entries in a Public Company's Books, Records, and Accounts**
**(17 C.F.R. § 240.13b2-1; 15 U.S.C. §§ 78m(b)(5), 78m(b)(2), and 78ff(a))**

1.      The General Allegations section of this Superseding Indictment, as well as the

allegations contained in the Purpose of the Conspiracy, Manner and Means of the Conspiracy,

and Overt Act paragraphs of Count 1 of this Superseding Indictment, are realleged and

incorporated by reference as though fully set forth herein.

2.      From at least in or around 2011, through in or around September 2014, in Miami-

Dade, Broward, and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the

defendant,

**EDWARD J. DIMARIA,**

did knowingly and willfully falsify and cause to be falsified books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of Bankrate as more particularly described below:

| Count | Defendant | Approximate Date(s) | Description of Falsified Book, Record, or Account |
|-------|-----------|---------------------|----------------------------------------------------|
| 5 | **EDWARD J. DIMARIA** | February 24, 2012 | Approximately $130,000 in accounting expense booked to Bankrate's accrued deal costs account against "cushion" |
| 6 | **EDWARD J. DIMARIA** | April 11, 2012 | Approximately $180,000 in "cushion" reversed from Bankrate's affiliate commissions account in the Credit Cards division |
| 7 | **EDWARD J. DIMARIA** | April 11, 2012 | Approximately $50,000 in "cushion" reversed from Bankrate's Employee Federal Withholding account |

In violation of Title 15, United States Code, Sections 78m(b)(2), 78m(b)(5), and 78ff(a); Title 17, Code of Federal Regulations, Section 240.13b2-1; and Title 18, United States Code, Section 2.

## COUNT 8
### Conspiracy to Commit Securities Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1.     The General Allegations section of this Superseding Indictment, as well as the allegations contained in the Purpose of the Conspiracy, Manner and Means of the Conspiracy, and Overt Act paragraphs of Count 1 of this Superseding Indictment, are realleged and incorporated by reference as though fully set forth herein.

2.     From at least in or around 2011, through in or around September 2014, in Miami-Dade, Broward, and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendant,

**EDWARD J. DIMARIA,**

did knowingly, that is, with the intent to further the objects of the conspiracy, and willingly combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.        to knowingly and willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purposes of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343; and,

b.        to knowingly and willfully execute a scheme and artifice (a) to defraud any person in connection with any security of Bankrate, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by statements containing material omissions, any money and property in connection with the purchase and sale of any security of Bankrate, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), in violation of Title 18, United States Code, Section 1348.

## Purpose of the Conspiracy

3.        The Purpose of the Conspiracy section of Count One of this Superseding Indictment is realleged and incorporated by reference as though fully set forth herein.

**Manner and Means of the Conspiracy**

4.      The Manner and Means of the Conspiracy section of Count One of this Superseding Indictment is realleged and incorporated by reference as though fully set forth herein.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 9
### Wire Fraud
### (18 U.S.C. § 1343)

1.      The General Allegations section of this Superseding Indictment, as well as the allegations contained in the Purpose of the Conspiracy, Manner and Means of the Conspiracy, and Overt Act paragraphs of Count 1 of this Superseding Indictment, are realleged and incorporated by reference as though fully set forth herein.

2.      From at least in or around 2011, through in or around September 2014, in Miami-Dade, Broward, and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendant,

**EDWARD J. DIMARIA,**

did knowingly and willfully, and with the intent to defraud, devise and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing such scheme and artifice to defraud, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds.

24

## Purpose of the Scheme and Artifice

3.      The Purpose of the Conspiracy section of Count One of this Superseding Indictment is realleged and incorporated by reference as a description of the Purpose of the Scheme and Artifice.

## The Scheme and Artifice

4.      The allegations contained in the Manner and Means of the Conspiracy and Overt Acts sections of Count 1 of this Superseding Indictment are realleged and incorporated by reference as a description of the Scheme and Artifice.

## Use of the Wires

5.      **EDWARD J. DIMARIA**, for the purpose of executing the aforesaid scheme and artifice to defraud, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, to wit, on or about August 28, 2012, **EDWARD J. DIMARIA** caused to be sent an electronic mail attaching a "cushion" spreadsheet from Hyunjin Lerner in Florida to **EDWARD J. DIMARIA** in New York.

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 10
### Securities Fraud
### (18 U.S.C. § 1348)

1.      The General Allegations section of this Superseding Indictment, as well as the allegations contained in the Purpose of the Conspiracy, Manner and Means of the Conspiracy, and Overt Act paragraphs of Count 1 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

25

2.      From in or around at least 2011, through in or around September 2014, in Miami-Dade, Broward, and Palm Beach Counties, in the Southern District of Florida and elsewhere, the defendant,

**EDWARD J. DIMARIA**,

did knowingly and willfully execute a scheme and artifice (a) to defraud any person in connection with any security of Bankrate, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by statements containing material omissions, any money and property in connection with the purchase and sale of any security of Bankrate, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), to wit, **EDWARD J. DIMARIA**, Lerner, and their co-conspirators made, and caused to be made, false and misleading representations to Bankrate's shareholders and members of the investing public about Bankrate's true financial condition.

In violation of Title 18, United States Code, Sections 1348 and 2.

## FORFEITURE
### (18 U.S.C. § 981(a)(1)(C))

1.      The allegations of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of certain property in which the defendant, **EDWARD J. DIMARIA**, has an interest.

2.      Upon conviction of a violation of Title 18, United States Code, Section 371, and/or a violation of, or a conspiracy to violate, Title 18, United States Code, Sections including 1343, 1348, and, Title 15, United States Code, Section 78ff and, Title 17, Code of Federal Regulations, Part 240.13b2-2, as alleged in this Superseding Indictment, the defendant so convicted shall forfeit

to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such violation.

## Substitute Assets Provision

3.      If any of the above described forfeitable property, as a result of any act or omission of the defendant:

1)      cannot be located upon the exercise of due diligence;

2)      has been transferred or sold to, or deposited with, a third party;

3)      has been placed beyond the jurisdiction of the Court;

4)      has been substantially diminished in value;

5)      or has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), made applicable by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

27

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and the provisions of Title 21, United States Code, Section 853, made applicable by Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____

FOREPERSON

_____

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

SANDRA MOSER, ACTING CHIEF
FRAUD SECTION, CRIMINAL DIVISION

HENRY P. VAN DYCK, ASSISTANT CHIEF
EMILY SCRUGGS, TRIAL ATTORNEY
JASON COVERT, TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U. S. DEPARTMENT OF JUSTICE

28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

EDWARD J. DIMARIA,

Defendant.

_____ /

CASE NO.      17-20898-CR-KMM(s)_____

**CERTIFICATE OF TRIAL ATTORNEY***

**Superseding Case Information:**

**Court Division**: (Select One)

New Defendant(s)          Yes ____   No   X

Number of New Defendants          0

__X__  Miami     _____ Key West

Total number of counts          10

_____  FTL      _____ WPB   ___FTP

I do hereby certify that:

1.   I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.   I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.   Interpreter:      (Yes or No)      No___
     List language and/or dialect      _____

4.   This case will take      15   days for the parties to try.

5.   Please check appropriate category and type of offense listed below:

(Check only one)                          (Check only one)

I      0   to 5 days      _____          Petty      _____
II     6   to 10 days     _____          Minor      _____
III    11  to 20 days     __X__          Misdem.    _____
IV     21 to 60 days      _____          Felony     __X__
V      61 days and over   _____

6.   Has this case been previously filed in this District Court?   (Yes or No)   __Yes__
If yes:
Judge: K. Michael Moore                     Case No. 17-20898-CR-KMM_____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?      (Yes or No)      No__
If yes:
Magistrate Case No.                     _____
Related Miscellaneous numbers:      17-20235-CR-KMM_____
Defendant(s) in federal custody as of      _____
Defendant(s) in state custody as of      _____
Rule 20 from the District of
Is this a potential death penalty case? (Yes or No)      No__

7.   Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office
     prior to October 14, 2003?      Yes _____      No __x__

HENRY P. VAN DYCK
DOJ ASSISTANT CHIEF
Court ID No. A5501507

*Penalty Sheet(s) attached

REV 5/3/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**: EDWARD J. DIMARIA

**Case No**:      17-20898 CR-KMM(s)

Count #: 1

Conspiracy to Make False Statements to a Public Company's Accountants, and to Falsify Books, Records, and Accounts of a Public Company

18 U.S.C. § 371

\* Max. Penalty:      Five (5) Years' Imprisonment

Counts #: 2-4

False Statements to Accountants

17 C.F.R. § 240.13b2-2; 15 U.S.C. § 78ff(a); 18 U.S.C. § 2

**\* Max. Penalty**:      Twenty (20) Years' Imprisonment

Count #:  5-7

False Entries in a Public Company's Books, Records and Accounts

17 C.F.R. § 240.13b2-1; 15 U.S.C. §§ 78m(b)(5), 78m(b)(2), and 78ff(a); 18 U.S.C. § 2

**\* Max. Penalty**:      Twenty (20) Years' Imprisonment

Count #: 8

Conspiracy to Commit Securities Fraud and Wire Fraud

18 U.S.C. § 1349

**\* Max. Penalty**:      Twenty (20) Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

Count #: 9

Wire Fraud

18 U.S.C. §§ 1343, 2

**\* Max. Penalty**:      Twenty (20) Years' Imprisonment

Count #: 10

Securities Fraud

18 U.S.C. §§ 1348, 2

**\* Max. Penalty**:      Twenty-five (25) Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**