**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 17-20898-CR-MOORE/SIMONTON**

**UNITED STATES OF AMERICA,**

   **v.**

**EDWARD J. DIMARIA,**

   **Defendant.**

_____/

**SENTENCING MEMORANDUM ON BEHALF OF EDWARD J. DIMARIA**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES…………………………………………………………………...ii

I.   MR. DIMARIA'S PERSONAL HISTORY AND CHARACTERISTICS ........................... 1

A.   Mr. DiMaria's Personal and Family History ........................................................... 1

    i.   Mr. DiMaria was raised in a close-knit family and learned from an early age the value of hard work.................................................................................................. 1

    ii.   Mr. DiMaria spent his twenties working long hours and laying the foundation for a lasting marriage.................................................................................................. 2

    iii.   Mr. DiMaria devoted his energies to being a well-respected colleague.......................... 4

    iv.   Mr. DiMaria worked hard to support his family, but it was the time he spent with them that he cherished most. ........................................................................... 6

        1.   Fatherhood.................................................................................................. 6

        2.   Family........................................................................................................ 12

        3.   Community.................................................................................................. 14

B.   Mr. DiMaria's Acts of Service to his Faith ........................................................... 17

    i.   Mr. DiMaria's faith has been a central focus of his life. ............................................... 17

        1.   Emmaus .................................................................................................... 19

        2.   Other Charitable Programs ......................................................................... 23

II.   CIVIL PENALTIES AND SUBSEQUENT CRIMINAL ACTION ................................... 28

III.   APPLICATION OF THE 18 U.S.C. § 3553(A) FACTORS WARRANTS A VARIANCE FROM THE GUIDELINES ................................................................... 29

A.   The History and Characteristics of the Defendant................................................. 33

B.   The Offense Conduct .............................................................................................. 34

C.   A Variance Will Avoid Unwarranted Sentencing Disparities ................................ 37

D.   A Below-Guidelines Sentence Will Provide Adequate Specific and General Deterrence .............................................................................................................. 45

    i.   Specific Deterrence ....................................................................................... 45

    ii.   General Deterrence ....................................................................................... 46

IV.   FORFEITURE ................................................................................................................ 48

V.   RESTITUTION ............................................................................................................... 48

VI.   FINE .............................................................................................................................. 48

VII. FEDERAL DESIGNATION .......................................................................................... 48

VIII.   CONCLUSION........................................................................................................... 49

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Calkins v. United States*,
  795 F.3d 896 (8th Cir. 2015) ...............................................................30

*Gall v. United States*,
  552 U.S. 38 (2007)................................................................................29

*Koon v. United States*,
  518 U.S. 81 (1996)................................................................................33

*Pepper v. United States*,
  562 U.S. 476 (2011)..............................................................................33

*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006)..............................................30, 31

*United States v. Anderson*,
  267 F. App'x 847 (11th Cir. 2008) .......................................................31

*United States v. Baker*,
  1:13-cr-00346-SS (W.D. Tex. Nov. 3, 2017) .................................41, 42

*United States v. Block*,
  No. 1:16-cr-00595-JPO (S.D.N.Y.) ............................................ *passim*

*United States v. Booker*,
  543 U.S. 220 (2005)..............................................................................29

*United States v. Corsey*,
  723 F.3d 366 (2d Cir. 2013)..................................................................30

*United States v. Croteau*,
  819 F.3d 1293 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 254 (2016)....................................37

*United States v. Faibish*,
  No. 12-cr-265 (ENV), 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015) .....................................32

*United States v. Gordon*,
  No. 4:09-cr-00013-JHP (N.D. Okla. Oct. 29, 2010)..............................30

*United States v. Gray*,
  453 F.3d 1323 (11th Cir. 2006) .............................................................45

KL3 3181583.1

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) ............................32

*United States v. Jayyousi*,
   657 F.3d 1085 (11th Cir. 2011) .................................................................................45

*United States v. Johnson*,
   No. 16-cr-457-1 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) .................................31

*United States v. Kipp*,
   No. 3:15-cr-00244-MOC-DSC (W.D.N.C.) ............................................................ *passim*

*United States v. Kuhlman*,
   711 F.3d 1321 (11th Cir. 2013) .................................................................................46

*United States v. Lumiere*,
   No. 16-cr-00483 (S.D.N.Y. June 14, 2017) ...............................................................30

*United States v. Matchett*,
   802 F.3d 1185 (11th Cir. 2015) .................................................................................29

*United States v. Montgomery*,
   165 F. App'x 840 (11th Cir. 2006) ...........................................................................31

*United States v. Orton*,
   73 F.3d 331 (11th Cir. 1996) ....................................................................................34

*United States v. Parris*,
   573 F. Supp. 2d 744 (E.D.N.Y. 2008) ......................................................................32

*United States v. Rand*,
   835 F.3d 451 (4th Cir. 2016) ......................................................................41, 42 n.20

*United States v. Spencer*,
   700 F.3d 317 (8th Cir. 2012) ....................................................................................32

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009) .......................................................................................43

*United States v. Vawter*,
   167 F. App'x 101 (11th Cir. 2006) ...........................................................................31

**Federal Statutes**

18 U.S.C. § 3143(a) ...................................................................................................48

18 U.S.C. § 3553(a) ............................................................................................. *passim*

18 U.S.C. § 3553(a)(1)-(7).........................................................................................29

iii

18 U.S.C. §§ 3553(a)(2)(B) and (C) ...................................................................45

U.S.S.G. § 2A2.1(a)(2) ......................................................................................32

U.S.S.G. § 2B1.1 ...............................................................................................39

U.S.S.G. §§ 2B3.1(a), (b)(7) .............................................................................33

U.S.S.G. § 5G1.1 ...............................................................................................30

**Other Authorities**

*Bankrate: Raising Interest* (June 8, 2006),
     https://www.kiplinger.com/article/investing/T038-C008-S001-bankrate-
     raising-interest.html ...................................................................................36 n.11

*Christ*, Diocese of Bridgeport, https://www.bridgeportdiocese.org/aca/cindy-and-
     edward-dimaria-from-st-jude-parish-in-monroe-explain-how-their-role-
     honors-and-serves-christ/.............................................................................26 n.8

Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*,
     61 Wayne L. Rev. 27, 48-49 (2015) .................................................................47

Preet Bharara at 11 (Feb. 16, 2011), https://www.ussc.gov/sites/default ....................................31

Press Release, Apax Partners, *Bankrate, Inc. agrees to be acquired by Apax
     Partners for $28.50 per share in cash* (July 22, 2009),
     http://www.apax.com/news/press-releases/2009/july/bankrate,-inc-agrees-to-
     be-acquired-by-apax-partners-for-$2850-per-share-in-cash/............................36 n.12

Press Release, Dep't of Justice, Federal Judge Hands Down 10-Year Sentence to
     Former Chief Accounting Officer for Beazer Homes USA, Inc. (Apr. 30,
     2015), https://www.justice.gov/usao-wdnc/pr/federal-judge-hands-down-10-
     year-sentence-former-chief-accounting-officer-beazer-homes........................41 n.20

Press Release, Dep't of Justice, Former CEO of Arthrocare Corporation
     Sentenced to 20 Years in Prison for Role in $750 Million Securities Fraud
     Scheme (Nov. 3, 2017), https://www.justice.gov/opa/pr/former-ceo-
     arthrocare-corporation-sentenced-20-years-prison-role-750-million-securities-
     fraud ............................................................................................................41 n.20

Press Release, Red Ventures, *Bankrate to Be Acquired by Red Ventures for
     $14.00 per Share* (July 3, 2017), https://www.redventures.com/media/red-
     ventures-to-acquire-bankrate.html ...............................................................37 n.16

Press Release, U.S. Securities and Exchange Commission, *SEC Charges CSC and
     Former Executives with Accounting Fraud* (June 5, 2015),
     https://www.sec.gov/news/pressrelease/2015-111.html .......................................44

Press Release, U.S. Securities and Exchange Commission, *SEC Charges Diebold and Former Financial Executives With Accounting Fraud* (June 2, 2010), https://www.sec.gov/litigation/litreleases/2010/lr21543.htm ...................................................44

Richard S. Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005)......................................47

St. Joseph High School, https://www.sjcadets.org/uploaded/Admissions/ ..................................10

Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest*, 17 Hofstra L. Rev. 1, 22 (1988) ..........................................................47

U.S. Sentencing Commission, RECIDIVISM AMONG FEDERAL OFFENDERS: A COMPREHENSIVE OVERVIEW 23 (2016), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf; ......................................45

We submit this memorandum on behalf of Edward DiMaria, who is scheduled to be sentenced by this Court on September 25, 2018.  We address in this submission the relevant sentencing considerations set forth in 18 U.S.C. § 3553(a) and endeavor to provide the Court with a broader and deeper understanding of who Mr. DiMaria is and how he has led his life.  We also aim to explain the offense conduct in order to demonstrate that this case is different from the typical criminal fraud case.  The ultimate objective of this submission is to demonstrate to the Court that the ten-year statutory maximum sentence to which Mr. DiMaria is exposed based on the counts to which he pleaded guilty provides a ceiling but not a floor.  We respectfully submit that when weighing Mr. DiMaria's conviction against his otherwise law-abiding life, and considering the Section 3553(a) factors, the Court should impose a sentence below 120 months.  We further submit that a sentence of significantly less than ten years would be "sufficient, but not greater than necessary" to achieve the purposes of sentencing.  18 U.S.C. § 3553(a).

## I.   MR. DIMARIA'S PERSONAL HISTORY AND CHARACTERISTICS

### A.  Mr. DiMaria's Personal and Family History

> i.   *Mr. DiMaria was raised in a close-knit family and learned from an early age the value of hard work.*

Edward Joseph DiMaria was born 53 years ago, on ▓▓▓▓▓▓▓ 1965, in Englewood, New Jersey, the second child of a close-knit family.  Presentence Investigation Report ("PSR") ¶¶ 77-78, *United States v. DiMaria*, No. 17-Cr.-20898 (KMM) (S.D. Fla. Dec. 19, 2017), DE 77.  A few years later the DiMarias relocated to Wappingers Falls, New York, where his parents still live.  PSR ¶¶ 77, 82.  His father, Ferdinand, was a mechanical engineer and his mother, Carol, a hospital administrator.  PSR ¶ 77.  Theirs was a family that would eat together every night and attend Mass together every Sunday at the same church where his mother has been singing in the choir since the late 1960s.

Mr. DiMaria learned early in life the value of industry and elbow grease. Though his parents worked hard to provide for their children, they lived a modest existence. (*See, e.g.*, F. DiMaria Jr. Ltr.).[1] When the neighborhood kids all began playing with go-carts, Ed was the kid who figured out how to build his own. (*See id.*). He worked hard during high school painting houses, mowing lawns, stocking shelves at a supermarket, and washing dishes and bussing tables at a restaurant. When he was in his late teens he worked in construction and picked up the trade, starting his own painting and tiling business in order to help pay for his college education, (*see, e.g.*, C. Mangini Ltr.), and employing his younger brother Fred in the process.

Those who knew Mr. DiMaria in his youth recall a respectful, soft-spoken and considerate child. (*See, e.g.*, B. McGowan Ltr.; D. Lucia Ltr.). An all-around athlete, Mr. DiMaria alternated through the seasons between football, track and baseball. When it came time for college his father impressed upon him the need to prove himself academically, and so Mr. DiMaria continued to live at home after graduation, attending classes at Dutchess Community College in Poughkeepsie, New York. There Mr. DiMaria became a successful student and eventually transferred to Pace University to pursue a degree in accounting.

      ii.    *Mr. DiMaria spent his twenties working long hours and laying the foundation for a lasting marriage.*

Not long after graduating from Pace University, Mr. DiMaria began working at one of the large accounting firms, KPMG, in its Stamford, Connecticut office. Mr. DiMaria spent most waking hours at the office, day in and day out. His roommate at the time, also a colleague at KPMG, recalls "little time for anything else." (G. Burdo Ltr.; *see also* C. De Gasperis Ltr.).

---

[1] The letters in support of Mr. DiMaria are attached to this memorandum and designated as Exhibits 1-133. An Exhibit Table of Contents is included listing the letters in alphabetical order by last name and indicating the corresponding exhibit number.

It was in this grueling phase of life that by chance encounter one Friday afternoon in the spring of 1989, Mr. DiMaria met his future wife, Cynthia ("Cindy") Rossi.  While working out of the headquarters of one of his client's offices, three women from a nearby advertising agency who were making use of the client's boardroom for purposes of their ad campaign, asked whether Mr. DiMaria and some of the other junior accountants would be willing to sit for a photo-shoot.  Cindy, one of the account executives at the agency, was sitting across the table from Ed that day.

They started dating and were a perfect match.  As they began to plan their lives together, Cindy, who was raised in her mother's Protestant faith but baptized Catholic in her father's, decided to convert to Catholicism.  Ed was Cindy's sponsor to the Rite of Christian Initiation of Adults ("RCIA") and, wanting to further support her in the process, took the yearlong course by her side.

Ed and Cindy were married on September 22, 1991, in Norwalk, Connecticut.  *See* PSR ¶ 80.  In the ensuing twenty-seven years they have maintained their commitment to their early vows, guided by their shared faith and their dedication to family.  Before their wedding day, Ed moved into what would be their first home together in order to paint and finish it.  They spent the next fourteen years in that house and welcomed all three of their children to the world.  Matthew Christopher DiMaria was born in 1993, followed three years later in 1996 by Marissa Georgine, and in 2003, by their youngest, J█████ P██.

After Matthew was born, Cindy and Ed made the conscious decision to give their children the same family-oriented childhood of their youths.  (*See* Cindy DiMaria Ltr.; *see also* E. Banks Ltr.).  Cindy became a stay-at-home-mother and together she and Ed made theirs into a loving and supportive home, in good times and bad.  (*See* Cindy DiMaria Ltr. ("Ed is my best

friend and had always been there for me and the kids emotionally through good times and very bad times.")).  Friends and family describe Ed and Cindy's marriage as one of devotion and cooperation.  (*See, e.g.*, P. & G. McDonagh Ltr. ("Eddie and Cindy are a team.  We remember a New Year's party we attended at their home and watched them jointly prepare apps: him making homemade coconut shrimp in the fryer, she coating them in the batter and handing them to him, not missing a beat.  They are this way with everything.")).[2]  They support one another in what is best for their children and in their individual relationships to their faith.  Ed and Cindy's shared joys have been in raising their children, volunteering at their church, and simple tasks, such as gardening, hiking, and tending to their home.

iii.    *Mr. DiMaria devoted his energies to being a well-respected colleague.*

The same work ethic that Mr. DiMaria cultivated at KPMG carried with him into future professional pursuits.  Co-workers remember him as "an excellent manager, leader and colleague."  (B. Zanca Ltr.).  Bruce Zanca, who served in the Reagan Administration as a Special Assistant to Attorney General Edwin Meese at the U.S. Department of Justice, and later as the spokesperson for George H.W. Bush at the White House, describes Mr. DiMaria as "among the finest people [he has] known."  (B. Zanca Ltr.).

Mr. DiMaria is consistently lauded as a hard-worker who led by example.  He was "routinely the first person at the office and one of the last to leave each day."  (B. Zanca Ltr; *see also* S. Horowitz, Ltr. ("This doesn't just mean he was the first one in the office and the last one to leave the office.  Simply put, Ed worked extremely hard and diligently, no matter the circumstances."); M. Ricciardelli Ltr. ("He was often the last one to leave the office, turning the

---

[2] *See also* T. Parenteau Ltr. ("Eddie and Cindy are perfect together. They share the same great morals and values which makes them so very compatible . . ."); M. Rossi Ltr. ("For all the time I have known him [Ed] has been a doting husband . . ."); E. Bianco Ltr. ("He has always treated Cindy like a queen…").

4

lights out when he left.")).  Despite his typical 15-hour work day, (R. Mangini Ltr.), as one friend commented, "[e]ven on 'bad days' [Ed] would classify it as a bump in the road, shake it off and passionately go back to work," (E. Banks Ltr.).  Dan Hoogterp found Mr. DiMaria's "energy and thoroughness" qualities that made him "a joy to work with."  (D. Hoogterp Ltr. (recalling how Mr. DiMaria reviewed and evaluated "every nuance of the voluminous information" while working on a consulting project together)).  Kevin Hayden, who worked with Mr. DiMaria in the early 1990s at a small airline, found his work ethic to be so "outstanding" that he later recommended Mr. DiMaria for what would be his future job as CFO of Official Payments.  (K. Hayden Ltr.).

Colleagues looked up to Mr. DiMaria as a mentor and friend.  Hanno Damm recalls how shortly after Mr. DiMaria hired him, Mr. DiMaria gave him "substantial responsibility" and "encouraged [him] to take on larger roles," providing the "confidence and encouragement [Mr. Damm] needed to thrive."  Mr. Damm "believe[s] [Mr. DiMaria] was a critical catalyst to [his] future successes in business" by giving him "the direction and motivation [he] needed to feel ready to take the lead on projects and manage staff on [his] own."  (H. Damm Ltr.).  Steve Horowitz believes himself to be a "better manager and person for [his] direct interactions and indirect observations of Ed."  (S. Horowitz Ltr.).  Corrado De Gasperis experienced how Mr. DiMaria "genuinely cared about helping" him when they worked together on an audit assignment, when Mr. De Gasperis felt like he was the "slowest learner on the team."  He recalls how Mr. DiMaria came over and walked him through the objectives, "coaching [him] forward." (C. De Gasperis Ltr.).

In addition to being supportive of his colleagues in their professional success, Mr. DiMaria was also "concerned for [their] . . . well-being."  (B. Zanca Ltr.).  Mr. Zanca remembers

KL3 3181583.1

that when he was "charged with finding a new health care plan for [their] 500+ employees" at a time when costs for "healthcare insurance were skyrocketing . . . Ed rejected options that increased the cost for [the] rank-and-file employees and championed a plan that maintained the level of benefit without an increase in costs for employee contributions."  (B. Zanca Ltr.).

Meanwhile, "when one of Ed's accounting employees . . . suffered a house fire the day before Thanksgiving, Ed personally made sure that [she] and her family had the funds they needed to relocate and were safe.  Another time . . . Ed donated some of his accumulated personal time off (PTO) to an employee who exhausted her own leave taking care of her gravely sick child."  (B. Zanca Ltr.).

        iv.    *Mr. DiMaria worked hard to support his family, but it was the time he spent with them that he cherished most.*

        1.   Fatherhood

Despite his arduous work schedule over many years, Mr. DiMaria has been a steadfast and loving father.  From the time Matthew was an infant, Mr. DiMaria "managed to balance work and fatherhood just perfectly," (E. Banks Ltr.), "always prioritiz[ing] his family first," (D. Ross Ltr.; *see also* Cindy DiMaria Ltr. (Ed "typically started his day at 5:00 am and commuted two and a half hours each way . . . return[ing] home around 8:30 or 9:00 pm . . . [after] demanding and stressful days, yet through it all, he never complained.  On the contrary, upon returning home, he always made time for each member of the family.")).  His former colleague Steve Horowitz remembers when Mr. DiMaria's son J██████ collapsed in their driveway as a toddler and was diagnosed with a potentially fatal genetic heart defect, "Ed never missed a beat at home or at work.  He just worked hard to find the next positive, which would lead to the next answer, which would lead to the next tough choice, which would lead to further hard work and

determination, which would ultimately lead to his son living the most fruitful life possible." (S. Horowitz Ltr.).

Both J█████ and Matthew DiMaria suffer from a hereditary heart condition called Long QT Syndrome. It is a defect in the electrical system, specifically the potassium channels, of the heart, which can cause arrhythmia and sudden death. Both of Mr. DiMaria's sons carry the mutations for the KCNQI gene (the gene responsible for the production of normal potassium channels), but while J█████ is symptomatic and requires a strict treatment regimen, Matthew is only a carrier for the mutation and is otherwise clinically normal. Marissa does not possess the mutation for Long QT Syndrome but suffers from an immune disorder, HSP-Henoch Schonlein Purpura, for which she has had to be hospitalized. When the DiMarias first discovered their children's health conditions, Mr. DiMaria spent day and night researching and educating himself and his family. (*See, e.g.*, Cindy DiMaria Ltr; E. Banks Ltr.; T. & J. Parenteau Ltr.). When his children each fell ill, Mr. DiMaria was a doting and devoted father, caring for both the child that was hospitalized as well as his two at home. (*See, e.g.*, E. Banks Ltr.; *see also* B. Zanca Ltr. ("Ed spent weeks and months at his son's side finding the best doctors to treat this rare condition. Ed was a rock for his wife and young son during this terrifying medical emergency.")). Despite the potential seriousness of J█████'s condition, the DiMarias have not let it rule his life and have educated and empowered themselves and others so that J█████ is safe and need not worry. (*See, e.g.*, L. Roman Ltr.).

Edward DiMaria worked hard to be home with his family as an active participant in his children's lives, "providing advice and guidance, and setting standards of good behavior by his example." (P. & G. McDonagh Ltr.). Ed was the coach on Matthew's little league team, (*see* P. Terrell Ltr.), and the go-to person for any school project that required props, (*see* A. Lonardo

Ltr.).  Whether it was Cub Scouts den meetings, PTO meetings, school band performances, basketball games, or church events, Mr. DiMaria made the effort to be at any event he could, (*see, e.g.*, M. & R. Tedesco Ltr.; D. Feneley Ltr.).

Matthew DiMaria describes how from "birthdays [to] basketball games, to . . . band concerts and school events, [his father] has always made time for [him] despite his hectic work schedule."  (Matthew DiMaria Ltr.).  Like her older brother, Marissa remembers how her father "never missed any of [her] dance recitals," and "always made time to come down to the barn" where she rode.  (Marissa DiMaria Ltr.).  Mr. DiMaria would similarly attend J███████'s basketball games as "an attentive and supportive father," (C. & M. Baudouin Ltr.), who would "emphasize good sportsmanship and kindness to others," (T. & M. Dineen Ltr.).

Mr. DiMaria was the father who "would wake up early to mow the lawn so that [his son and his son's best friend] could practice [their] golf swings in the front yard," and who took the two of them fishing at 4 a.m. when they were a little older.  (R. Beauchamp Ltr.).  Even when Matthew and his friends "would spend the night seemingly determined to dent the garage door with errant basketballs, Ed would welcome [them] in with a plate of homemade Italian food and a smile on his face."  (R. Beauchamp Ltr.).  Matthew's childhood friend, Emerson Ball, remembers the many nights he and Matthew played basketball at the DiMaria home and seeing Mr. DiMaria return late "into the evening well after 9:00 P.M."  Even on those late nights, Mr. DiMaria was the kind of father who would enthusiastically help his son and his son's friend with a woodworking project they were completing.  (E. Ball Ltr.).

Mr. DiMaria has been a parent "intensely dedicated" to his family's well-being, who "[u]nlike many of his neighbors . . . did not display this dedication by simply providing for his family [to] 'their' hearts' desire.'"  Instead, he and Cindy have raised children who have "learned

to enjoy the simplest things in life."  (Fr. Skip Ltr.; *see also* G. Burdo Ltr. (Ed's "happiness is in

how our family lives not in materialistic things.")).  Cindy and Ed "tried to never spoil [their]

children," and "Ed felt it was important for them to always work hard doing chores to earn

money for their own personal expenses.  Matthew and Marissa both got jobs as soon as they

turned 16" at an ice cream parlor.  (Cindy DiMaria Ltr.).

      Mr. DiMaria has also been a source of wisdom and guidance for his children, comforting

his daughter after she had a rough night serving difficult patrons at her restaurant job, where she

worked to save money for college, (L. Roman Ltr.), and encouraging her as she decided what

path to pursue professionally, (Marissa DiMaria Ltr.; *see also* C. McBride Ltr. ("Mr. DiMaria

encouraged Marissa whether she was pursuing sociology, nursing, or psychology, which she

eventually found her passion for.")).  Mr. DiMaria was similarly there for Matthew "through

some of [his] toughest years back in high school, when [he] struggled with who [he] was, and

what [he] wanted to do with [his] life."  Mr. DiMaria would encourage his son "to go to various

church events with him," which is where Matthew "became interested in community service and

the idea of putting others before" himself.  (Matthew DiMaria Ltr.).  Mr. DiMaria recognized in

each of his children "their own unique personality and he has worked to help them understand

their personal gifts and has taught all of them to give back to the community."  (L. Roman Ltr.).

      Letters describe the DiMaria children as respectful, family-oriented, and caring of others.

(*See* M. & W. Rauser Ltr.; S. Rossi/M. Bianco Ltr.; L. Roman Ltr.).  The DiMaria children have

"a strong empathy for those who are less fortunate and [are] willing to put words into action."

(V. Eng Ltr.).  As their great aunt and uncle explain, "Matthew, is going to medical

school . . . .  All he has ever wanted to do is help people, and he got that from his father."  (R. &

P. Rossi).  Mr. DiMaria has instilled the same values in his daughter, Marissa, who hopes to

obtain a job working with children with autism.  (Cindy DiMaria Ltr.).  "Ed's youngest son is too young to have picked a career, but has the same generous spirit he inherited from his parents." (R. & P. Rossi).  Matthew, now twenty-four, graduated from The College of The Holy Cross and recently started Medical School at The University of New England in Maine.  In his spare time, Matthew has participated in service projects, such as travelling to Haiti to volunteer at an orphanage.  (C. Lanza Ltr.).  Marissa, twenty-one, has similarly dedicated much of her life to helping others and has engaged in numerous service activities during her four years at Providence College.  Having recently graduated, she is now looking for work in public service. ███, who is fifteen, begins his sophomore year of high school this fall.  He has already proven himself to be following in the footsteps of his siblings as someone dedicated to others. (*See, e.g.*, *Introducing St. Joseph High School Class of 2021*, St. Joseph High School, https://www.sjcadets.org/uploaded/Admissions/ Introducing _the_Class_of_2021.Edited.pdf ("███ D███ was recently selected for recognition by the Rotary Club of Monroe for the Service Above Self Award at Jockey Hollow. This special designation is only awarded to two students each year.")).  Mr. DiMaria is mentoring ████ as he did his older children "by participating with him in community service through his school as well as at their local parish." (M. Uhl Ltr.).

The DiMaria children are very well respected in their community.  (*See* C. Lanza Ltr. ("I would find Matt awake early on a Saturday morning to get a jump start on his studies" and he "could be found weekly at Mass, in meetings for the peer outreach group, COPE, and on the basketball court"); J. & D. Fedor Ltr. ("Matt is an amazing young man and he treats our daughter with so much respect and loves and takes great care of her.  We truly believe that these attributes are learned from the parents.  Ed has taught his son how to treat a lady."); E. Farrell Ltr.

10

(describing how as a sophomore at Holy Cross, Matthew spent his school break volunteering in India, administering "fundamental healthcare to Indian children in need," later becoming a program leader for the Holy Cross student immersion trip to Haiti); V. Eng Ltr. ("In addition to the National Honor Society, Marissa was an active member of the campus ministry and human relations clubs.  J████ was an altar server this past year . . . [t]hey are well liked and highly regarded by their fellow students, faculty, and administration."); Dcn. Tuccio Ltr. (J████ "stands out among his peers as well behaved and willing to participate in class – qualities to be admired in a teen today.  I firmly believe that this desire was instilled in him by the faith and love of Ed and Cindy.")).

Many people credit Ed and his wife with raising children who know the value of hard work, are polite, and are dedicated to helping others.  (*See* Dcn. Tuccio Ltr. ("All three of the DiMaria children are responsible, respectful, service oriented, devout, kind, and hard working.  These are qualities instilled by Ed and Cindy as loving and caring parents."); B. Zanca Ltr. ("I have always thought that you can get a good indication of a person's character by watching the behavior and actions of his children. Ed DiMaria is a dedicated and loving father and husband . . . . Ed and his wife Cindy are outstanding parents and have raised children who are excellent, principled people."); V. Eng Ltr. ("The children are fine individuals who actively reflect the values taught to them by their parents. They are friendly, personable, respectful, active in school activities, and excellent students. They are hard-working and set a high moral standard for themselves."); I. Kotulich Ltr. (Mr. DiMaria's "children are a great reflection of his work ethic and generosity . . . . [They] worked side by side with us during the fund raising and retreats. I never heard Ed, or his family complain.  Actually their joy and energy were pivotal many times . . . . They have [also] come to gatherings hosted by my children . . . [and] always greeted

11

me and thanked me for my hospitality.  There are very few teens that did this, and they did it with ease.")).

2.  <u>Family</u>

Mr. DiMaria "has provided support, comfort and dependability [not only] to his own nuclear family," but to his extended family "when circumstances dictate."  (A. Nelson Ltr.).  "Ed is a person the family counts on to be there when another member needs a helping hand, be it spiritual or simply being generous with his own time to ease another's burden."  (*Id.*).

Mr. DiMaria has been devoted to his and Cindy's aging parents, supporting them through illness and the daily tasks that become more difficult with time.  Mr. DiMaria helps care for his mother as she struggles with an advanced case of a degenerative immune disorder, Sjogren's Syndrome, which can cause a variety of problems, of which the most serious include heart and lung failure.  Mr. DiMaria's mother suffers heart- and lung-related complications owing to Sjogren's Syndrome.  Mr. DiMaria often takes his mother to see a specialist in Philadelphia and helps her when she has to spend a couple of weeks each year in the hospital.  Mr. DiMaria otherwise sees his parents every few weeks and talks to them at least every other day.  (*See, e.g.*, E. Martin Ltr. (noting how when Mr. DiMaria calls, it means "the world to Carol as he always [brings] light to her darkest pain.")).[3]

Mr. DiMaria was also a source of support to his mother-in-law in her own battle with illness, "research[ing] different doctors, hospitals, and treatment options," coming along to doctor's appointments – sometimes out of state – and taking notes.  "As her health deteriorated and she needed to be put on oxygen, Ed immediately brought over a generator so if the power went out, [she] wouldn't have to worry about her oxygen."  (L. Rossi Ltr.; *see also* P. Potter

---

[3] Mr. DiMaria was similarly helpful to his father in his treatment for prostate cancer, which is in remission.

Ltr.).  When she ultimately passed away in 2013, Mr. DiMaria "was instrumental in orchestrating the funeral.  He worked closely with [the] pastor to prepare the best possible service for her.  He spent countless hours choosing the hymns and bible passages for her service and read one aloud at the funeral.  The program he put together was a beautiful send off."  (L. Rossi Ltr.; *see also* A. Nelson Ltr. (After she passed away, Mr. DiMaria was a "constant guiding light to the family, a phrase it is not in my nature to deploy.")).

Mr. DiMaria has been a reliable champion of his family members whenever they have needed a friend in their corner, offering them work, a place to stay, a ride home, an open ear or an open heart.  By way of example:

- When his brother-in-law Michael returned from service in the U.S. Navy, a veteran of Desert Storm, he fell on hard times, "self-medicating and hanging out with the wrong kinds of people," spiraling to the point that he wound up in jail.  When he was released, "Ed with no questions asked, welcomed [Michael] into his home and offered [him] construction work doing some renovations on his house."  (M. Rossi Ltr.).  Michael describes how it was "hard and saddening to feel that [he was] intruding or putting strain on anyone, but Ed made sure to never let [him] feel that way. [Ed] provided [Michael] a room until [he] got back on [his] own feet," and showed him "what it meant to be the man of a household and to sacrifice for your family."  (*Id.*).  Twenty-five years later, Michael now owns his own carpentry and house painting business, managing numerous employees and providing for a family of his own.  (*Id.*).

- Mr. DiMaria's niece Cassidy found navigating the college process difficult and relied on her uncle "to answer questions and help [her] shape an idea for [her] future."  She recalls how it was on her birthday that he informed her he was going to help her pay part of her tuition and that he was proud of her performance in school and her dedication to community service.  (C. Stack Ltr.).  When she switched majors during college she once again turned to her uncle for insight and counsel.  She recalls how he would show up for her, asking "sincere questions," "offer[ing] to help [her] get an internship," and "drop[ping] [her] off at college during a snowstorm when [she] had no other means to get there."  (C. Stack Ltr.; *see also* P. Stack Ltr. ("As a single parent, [Ed] has always been an ear and shoulder to lean on in tougher times.  He acts as a father figure to my own daughter and provides her with the same guidance that Ed demonstrates consistently in our family.  Ed would attend my daughter's events, helped her with her religious studies . . . and helped to pay for her first year of college.")).[4]

---

[4] Mr. DiMaria was similarly supportive of his niece Inva who in entering her teenage years began "to stray from [her] academics" and was starting to "fall into the wrong types of crowds."  Mr. DiMaria offered her the option of attending Catholic school and took time off of work to go

13

- Mr. DiMaria's nephew was born "with Down Syndrome and a congenital heart defect. Ed's son Matt[hew] was born less than twenty-four hours later. Even with a newborn baby of his own, Ed called [his sister] every day," helping her "through an immensely difficult time." (C. Mangini Ltr.).[5]

### 3.  Community

"A lot of a person's character can be measured by how those around him treat him and speak of him. Ed has earned the friendship and trust of many within the community . . . . That is love, respect and trust that is earned daily . . . ." (S. & S. Beauchamp Ltr.).  Mr. DiMaria's friends and family know him to be someone who thinks of others ahead of himself.  (*See* M. Ricciardelli Ltr. ("Over the time I got to know Ed, his wife and his children I have been exposed to a man who thinks of others ahead of himself. Over the course of more than a decade you get to see personally what a man is made of, and Ed has shown me how to be a man of deep compassion, tenacity and selflessness."); L. Rossi Ltr. ("Ed is very thoughtful like that, always thinking of other people."); H. Damm Ltr. ("I knew him as a person who always puts others before himself, and as someone who keeps a positive disposition . . . no matter how difficult the circumstances")).  They describe him as someone who never takes credit, (D. & R. Lane Ltr.), who never complains, (I. Kotulich Ltr.; S. DiCairano Ltr.), and who "chooses to look for the good," (K. Dauk Ltr.).  "He doesn't see job title, social or economic status, race, sex, religion, etc. Ed just sees the human being before him, the matter at hand and how can he do and be his best to help. And he does all of this with an overabundance of patience and virtue and a paucity of hyperbole and self-interest."  (S. Horowitz Ltr.; *see also* C. Terrell Ltr. ("I have never heard [Ed] say a negative thing about another human being")).  "Ed [is] a caring and generous man,

---

on a tour with her and to help her to make a decision about her future.  (I. Vuthaj Ltr.).  He would also pick her and her brother up for Sunday Mass as his sister-in-law who "waitressed as a second job . . . was unable to provide that option for them."  (B. Memaj Ltr.).

[5] Mr. DiMaria's father notes how Mr. DiMaria has continued to be a consistent source of support to his nephew.  (F. Sr. DiMaria Ltr.).

generous in terms of giving his time, talents and energies to assist in whatever task, menial or otherwise, needed to be done."  (R. Giannino Ltr.).  "He lived through actions what others at times only espouse through words."  (M. Ricciardelli Ltr.).  Among his virtues are his willingness to forgive, (M. Fedor Ltr.), and his willingness to "always . . . lend a hand," (S. & S. Beauchamp Ltr.).

Friends recall how in times of economic hardship, Mr. DiMaria helped them find work, offered to pay for their son's tuition, (S. DiCairano Ltr.), or spent many hours helping to brainstorm and review materials as they faced the challenge of re-entering the workforce, (K. Dauk Ltr.).  He showed up with home-cooked meals when they battled cancer, (J. Roman Ltr.), came to the hospital arms-loaded with ways to entertain when their child was sick, (G. Burdo Ltr.), or called when their child struggled with addiction, (W. O'Boy Ltr.).  Mr. DiMaria stopped to "talk and give food or money to homeless people on the streets of New York," (B. Zanca Ltr.), and played with foster-care children, making them feel loved, (P. Stack Ltr.).  He took it upon himself to fix the popcorn machine for the sixth grade carnival when he discovered it was broken, (L. Roman Ltr.), sent the neighborhood kids home with fresh vegetables and homemade tomato sauce from his garden, (A. McDonagh Ltr.), and made sure to drive J████'s baby-sitter home so that her parents never worried.  (S. Feher Ltr.).  He personally sent care packages to our servicemen and coordinated with other organizations and churches to send letters and packages to soldiers deployed in Afghanistan.  (G. Roman Ltr.; J. Rossi Ltr. ("We had one satellite phone for us in cases of emergencies, otherwise, we would receive mail drops once per month, which was always the highlight . . . .  It never failed, the Soldiers . . . would have packages and letters waiting for [them] because of Ed and Cindy.")).  He cleared his neighbors "driveway[s] after a heavy snowfall," (S. & S. Beauchamp Ltr.; *see also* K. Moravek Ltr.; J.

Mesite Ltr.; J. Garvey Ltr.), carpooled their kids when they had to work, (K. Dauk Ltr.), and

opened up his home to help them with their business, (S. Feher Ltr.).  He brought food to the

construction crew working on his house, and paid the full amount when he noticed they had

undercharged.  (C. Navarro Ltr.).  He gave "generously to any organizations . . . [someone was]

championing (Runs for Cancer, Habitat for Humanity . . .)," (D. Ross Ltr.), and he often did so

quietly, behind the scenes, (*see, e.g.*, D. Feneley Ltr.).

Mr. DiMaria has lived his life, "not wrapped up in social trappings, but rather enjoy[ing]

the simple work of cutting [and] managing his lawn, building a shed behind his house and

helping his wife with the everyday tasks such as driving his kids to school and watching them

play sports."  (M. Ricciardelli Ltr.).  He spent his leisure time building his wife a better kitchen

with his own hands, taking a sledgehammer to his wall.  (*See, e.g.*, S. DiCairano Ltr.).  "On

weekends, if [he] wasn't busy spending time with the family [Mr. DiMaria was] performing

labor intensive work to tend" his house or to help out his parents, siblings, or in-laws.  (Cindy

DiMaria Ltr).  "You would never find Ed without some sort of tool in his hands.  Nor would you

ever find Ed laying on the couch relaxing."  (*Id.*).  No task was "too big or menial for Ed to

tackle.  Whether it was scrubbing mildew, carpet cleaning, washing the windows, working on the

car, weeding, mowing the lawn, knocking down walls, or re-doing electrical wiring there was no

limit to what Ed would do. . . . He was [also] very resourceful at teaching himself.  You could

always find Ed on YouTube watching a 'how-to' video," and in the age before the internet, he

used good old-fashioned books.  (*Id.*).

Family and friends alike are struck by the warmth of the DiMaria home.  Mr. DiMaria

could be found cooking up large plates of Italian sausage and peppers to feed his guests, (R. & P.

Rossi), and would "go out of his way to make everyone feel welcome and at home," (E. Bianco

16

Ltr. ("If someone was alone, he would go talk to that person and make them feel comfortable.")).
He is known for dropping whatever home improvement project might be underway to welcome
arrivals with affection.  (*See* S. DiCairano Ltr.; *see also* M. Gallivan Ltr.; M. Fedor Ltr.; A.
Lonardo Ltr. (all describing his hospitality)).  When a large group of guests from their parish
came to the DiMaria home for an annual progressive dinner Mr. DiMaria "stood by the door and
welcomed each family as if they were royalty."  (G. Roman Ltr.).  The DiMaria "house was the
place that [kids] would be able to hangout without worrying about the pressures of drugs and
alcohol," where "walking into their house was not only a sigh of relief, but . . . truly felt like
home."  (C. Terrell Ltr.).

### B.  Mr. DiMaria's Acts of Service to his Faith

   i.   *Mr. DiMaria's faith has been a central focus of his life.*

Mr. DiMaria's dedication to his faith has been the organizing principle of his life.  All
those close to him recognize his devotion to Catholicism, a devotion that has only grown
stronger and more profound through the years.  Ed and Cindy have been loyal parishioners of
Saint Jude Parish Church in Monroe, Connecticut since 1991, where they have long attended
weekly mass, and where their three children have been baptized and were altar servers.  (*See,
e.g.*, A. LeStrange Ltr.).  Mr. DiMaria's faith has deepened over time, particularly starting in the
early 2000s.  Eventually he began to attend daily mass one or two times a week, a practice that
has increased to almost daily observance.  (*See, e.g.*, B. Thibodeau Ltr. ("I typically see Ed at
daily mass Monday through Friday…"); D. Kirkham Ltr. ("I have also seen Ed many times at
weekday mass where he has demonstrated great reverence and devotion to God.  He can often be
found – both before and during mass – with his head bowed down in silent prayer.  This says a
lot about who Ed is.  To me, it shows faith, respect, humility, self-reflection, and love.")).  Even
while working as a busy CFO, Mr. DiMaria would take time out of his day to walk across the

street to the landmark St. Patrick's Cathedral for one of their services.  (*See, e.g.*, B. Zanca Ltr. ("Ed and I attended mass together at St. Patrick's Cathedral which was across the street from our New York City offices.")).

Those who have experienced him in prayer are touched by Mr. DiMaria's religious devotion, and have observed that in trying times his recourse has been to "see the good in the situation and put his faith in" God.  (Sr. M. Thibodeau; *see also* P. Terrell Ltr. ("He puts God before all and leads a very spiritual life. I have seen him rely on his faith to get him through some very difficult times, and I can attest to the fact that his faith has never wavered.")).  His friend and fellow parishioner, Sue Verespej, recalls a particular conversation with Mr. DiMaria in which they spoke about "God and the experiences [they've] had in [their] lives . . . . Ed carefully revealed a personal story of faith that reached down into his soul," by which Sue is "deeply affected" to this day.  (S. Verespej Ltr.).  Another parishioner, Mary Beth Rauser is similarly moved by Mr. DiMaria's faith from their time praying together; "[hi]s love of the Lord shines through and his witness to the faith is inspiring."  (M. & W. Rauser Ltr.).  Michael Bonomo recalls how "[e]ven before [he] knew Ed [he] noticed him at Mass," impressed with his active engagement and how he "was always deep in thought and prayer and never seemed to be distracted."  (A. & M. Bonomo Ltr.).  Mr. DiMaria has extended that depth of faith to his "scriptural knowledge.  He not only professes faith, but also the origins of it, including how faith, history, and reason support his strong belief and life system."  (D. Hoogterp. Ltr.).

   i. *Mr. DiMaria has lived his faith in action.*

Mr. DiMaria has translated his devotion to his faith into tangible works on behalf of others.  A champion of youth, volunteering many hours to see them find their way through faith, and an advocate for adults seeking to advance their own spiritual practice, he has been a friend to the needy, and a servant to his parish.  As one of his Deacons describes, Mr. DiMaria "is always

18

willing to help others no matter how difficult or humble the task and has taught the importance of service to community through example." (Dcn. Tuccio Ltr.). Those examples have included his commitment to catechism instruction, Emmaus Retreats, Vacation Bible School, the Cursillo Movement, the Serra Club, the Knights of Columbus, and Feed the People's Relief Program. In addition, Mr. DiMaria serves as a Eucharistic Minister and has served as Parish Finance Council President and Chair of the 2015 Annual Catholic Appeal.

1.  Emmaus

While Mr. DiMaria's commitment to the various organizations he supports is expansive, one example that best illustrates the depth with which he gives of himself is his work on behalf of a youth program, Emmaus. Emmaus is a three-day Catholic retreat for teens, which takes place once a year in the spring. (S. Verespej Ltr.). The weekend involves "song, skits, conversations, spiritual events, and personal sharing." (*Id*.). The purpose of the retreat is to "foster a spiritual journey for teenagers" and to allow the participants to "discuss anything openly in a safe environment." (L. DiMaria Ltr.). It is intended to be a "transformative and learning experience." (*Id*.). A participant's "Candidate Year" is typically in the 9th grade and students then return in the years that follow as part of what is called "Team." Team is the planning committee for the Emmaus Retreat and is made up of former Emmaus participants and dedicated adults, including Mr. DiMaria and his wife. Their son Matthew first attended the Emmaus Retreat in 2008 and Ed and Cindy were then invited to be a part of the planning Team for 2009, continuing to be active participants in the planning as well as the Retreat itself in the years that followed. (S. Verespej Ltr.).

The planning begins six months before the Retreat and is extensive. "To plan this Retreat for approximately 100 people, [the] 'Team' of . . . adults and teens meet weekly for three to four months prior to the Weekend." (S. Verespej Ltr.; *see also* A. & M. Bonomo Ltr.; B. Thibodeau

Ltr.; Dcn. Tuccio Ltr.).  The Team coordinates the Retreat, accounting for the teenagers, guest speakers, members of the clergy, and, on the final day, the families of the teens, as well as preparation for meals, security, spiritual events, and communication.  (*See* L. DiMaria Ltr.; S. Verespej Ltr.).  After the Retreat itself, the group continues to meet during "scheduled reunions and through other Church events."  (S. Verespej Ltr.).

During the months of planning, Mr. DiMaria would help "brainstorm and execute new ideas, reliably came to events, fundraisers and meetings, and took on much of the work himself." Mr. DiMaria would share "his knowledge and provide[] his support, while at the same time allowing others to have their ideas heard, considered and valued."  (E. Terrell Ltr.).  The DiMarias often hosted the preparation meetings at their home, and when others hosted Mr. DiMaria would "always stay late to help with clean up."  (C. Distasio Ltr.; R. Giannino Ltr.). Mr. DiMaria also "often led [the group] in prayer at the beginning and the end of . . . meetings." (L. Roman Ltr.).

One of the ministries in which Mr. DiMaria and Cindy participated was the Parent Ministry.  The Retreat is meant to be a surprise for the Candidates so it is shrouded in secrecy. Because of that and the fact that the Candidates are not allowed to bring their phones, the parents of the young teens are often anxious.  Mr. DiMaria and Cindy were responsible for "address[ing] their concerns and . . . for instilling confidence and trust in these families" whose children were under Emmaus' care.  (S. Verspej Ltr.; *see also* L. Roman Ltr. (Ed and Cindy "met with the parents of the teens that would be attending the retreat, explaining in detail what would happen on the weekend.")).

When parish leadership changed and they were no longer able to fund the Emmaus Retreat fully, Mr. DiMaria immediately "volunteered to be Finance and Fundraising

chairperson."  (J. Cardi Ltr.).  Mr. DiMaria "took the lead in starting fundraising" and worked "tirelessly to coordinate fundraisers like dinners and bake sales to help raise money."  (J. Cardi Ltr.).  Mr. DiMaria also donated "generously and anonymously" to the Retreat.  (J. Cardi Ltr.).

One of the fundraising initiatives that Mr. DiMaria and others brought to life was "a program serving Lenten dinners in the weeks leading up to Lent," for which Mr. DiMaria and two others "did most of the cooking."  (D. & S. Maslar Ltr.).  Mr. DiMaria would help get the dinners organized, coordinate the other participants, shop for the food, cook the meals, serve the guests, and help clean everything up when it was over.  (*See id*; *see also* I. Kotulich Ltr. ("He and his wife handled getting much of the food needed and generously donated extra foods too. He was always willing to help beyond what was expected.  He helped to set up the event, serve food to the guests, and help with the cleanup."); S. Verespej Ltr. (Ed was "right in there with his shirt sleeves rolled up cooking, serving, and interacting with the guests"); Dcn. Tuccio Ltr. ("Ed didn't just plan.  In the spirit of service he willingly took on the humble jobs in the kitchen as well as on clean-up.")).  Mr. DiMaria's wife and children also participated in the Lenten dinners, helping to serve and clean, "a shining example to the community of a family committed to each other, their faith and service to others."  (V. Eng Ltr.).

During the Retreat itself, Mr. DiMaria would "very quietly and humbly, go[] about helping in all aspects."  (J. Cardi Ltr.).  Whatever needed doing, Mr. DiMaria was willing to step up and get it done.  (*See* L. Costello Ltr. ("If a job was assigned to Ed you didn't have to worry, it would get done. He was very dependable.  Also regardless of whether something was assigned to him if he noticed a team member, either an adult or a kid, who needed help, Ed would step up to help."); L. Roman Ltr. ("He would do anything that was asked of him.  If [they] needed

someone to head the liturgy services, he would do that."); *see also* C. & T. Schmidt Ltr. ("he is a man who will help anyone who needs help")).

Mr. DiMaria would also frequently volunteer as a "Night Angel," which is considered "the hardest job as you have to stay up all night to ensure the teens remain safe and on the premises during the night hours." (J. Cardi Ltr; *see also* S. Roman Ltr. ("One of the hardest positions to fill on the weekend is that of a 'night watchman.' . . . When Ed heard we were having trouble filling the position his hand immediately went up. That's how Ed is. He's always willing to do the hardest jobs, or the one's nobody wants, for the good of all involved.")). "After his night angel responsibilities, [Mr. DiMaria would help] with breakfast and whatever" else was needed, setting an example for the others. (J. Cardi Ltr.). Mr. DiMaria also "provided assistance with many of the activities such as improv skits, crafts, and listening to" the Candidates' concerns. (C. Distasio Ltr.).

Mr. DiMaria would make "himself available to [the participants], providing guidance and direction and a listening ear to all in need. Ed would engage in individual discussion with the teenagers . . . and it was clear that [they] felt comfortable opening up to him." (A. & M. Bonomo Ltr.; *see, e.g.* M. Lenard Ltr. ("I always felt confident that Mr. DiMaria was someone that I could ask for advice about pretty much anything.")). "Sometimes it was the kids' first time away from their families and they weren't sure what to expect and Ed would make sure they were ok and reassure them about what was going to happen. He was helpful in explaining things to the kids and getting them calmed down." (L. Costello Ltr.). Mr. DiMaria would also organize "surprise visits from the parents as well as the Cara project where parents or other adult figures write letters to the teenagers that they open on the retreat." (K. Dauk Ltr.). Mr. DiMaria's niece remembers how the year she attended he arranged for her "family to surprise [her] at the retreat,

which was a big deal to [her] as they always worked.  Their surprise attendance was one of the
nicest things they have ever done with [her] and sits in a special place in [her] heart."  (I. Vuthaj
Ltr.).

    This past April was his son J███████'s candidate year.  During the Retreat J███████
"shared a very personal witness in front of over 50 adults and teens."  He was "proud to tell
[them] that the person in his life that has had the greatest influence and impact on his faith and
has been the best example of how to live a good Christian life is his father Ed."  (P. Terrell Ltr.).

## 2.  Other Charitable Programs

    Like Emmaus, Mr. DiMaria has quietly championed many worthy causes in service of his
community.

### *Youth*

- ***Vacation Bible School*** – While in elementary school all of the DiMaria children attended
  Vacation Bible School, later becoming participants in its administration.  Donna Lane recalls
  how "[e]ach summer, the DiMaria family would come to Vacation Bible School to share
  their love of Jesus to the participants of the program.  Ed in particular has assisted the VBS
  program . . . [by] cleaning up the building at the conclusion of the week."  (D. & R. Lane
  Ltr.).

- ***Catechism*** – In the early 2000s, while his children were still young, St. Jude's was looking
  for additional volunteers to teach catechism.  Mr. DiMaria made the time to volunteer.  For
  eight months of the year Mr. DiMaria would spend Sunday evenings with a group of high
  school freshman, imparting all the lessons they would need in order to be confirmed, a
  recognition of their adult membership in the Catholic Church.  The now-retired Director of
  Religious Education at St. Jude's remembers when "visiting [his] classrooms [she] saw that
  [Ed] was always sensitive and attentive to the needs of the families," and provided "age
  appropriate lesson plan[s]" that allowed his students to learn and grow "in their faith with his
  gentle, sincere and positive methodology."  (J. Paul Ltr.).  Mr. DiMaria has since inspired his
  niece, Cassidy, to become a catechism instructor.  (P. Stack Ltr.).

### *Adults*

- ***The Serra Club*** – Mr. DiMaria was one of the founding members of the Serra Club chapter
  in Bridgeport, Connecticut.  Father Henry Hoffman remembers being "approached by
  Deacon David Flynn for a recommendation for a couple to serve on the newly formed Serra
  Vocations club" and how the "first couple [he] thought of was Ed and Cindy DiMaria."  (Fr.

H. Hoffman Ltr.). Serra "provides support for men in . . . seminaries and provides outreach and support to parishes in [the] diocese to foster vocations to the Priesthood, Diaconate and religious life." (Fr. H. Hoffman Ltr.). The group sponsors guest speakers, holds receptions, facilitates fundraisers, throws picnics for the seminarians and their families and plans activities to increase awareness and support. The group also assists individuals who have specific needs along their journey to a life in service of their faith. From the time the Bridgeport chapter was chartered, Mr. DiMaria has been an active participant, attending the monthly meetings, assisting in the various events, and working directly to help individuals. Work for the group ranges from the "more ministerial, such as hosting meetings with seminarians, providing food for those meetings, and setting up the hosting sites" to more challenging tasks "such as providing an ear and support to those in the group. Ed DiMaria did it all from setting up hosting sites, hosting gatherings and providing unconditional support to those in need." (A. & T. Field).[6]

- *The Cursillo Movement* – Mr. DiMaria has directed his energies towards a program for adults called the Cursillo Movement. Like Emmaus, it involved a weekend Retreat, but Mr. DiMaria's involvement and commitment has really been in continuing to meet with the participants every few weeks. Mr. DiMaria "meets weekly with other men to listen and support them as they speak openly about their faith walk, spiritual reading and how they are leading others to Christ." (B. Thibodeau Ltr.). As with Emmaus, Ed's friend Joe Kotulich notes that with Cursillo "there too, [he and Ed] have served as team members for the three day retreats together multiple times." (J. Kotulich Ltr.).

*Those in Need*

- *The Knights of Columbus* – The Knights of Columbus is a "Catholic-based Fraternal Organization engaged in charity both locally and globally." (D. & R. Lane Ltr.). As a Knight, Mr. DiMaria "has volunteered to raise money for [those living with mental disabilities] (the Knights sponsor a . . . residential living program for men with mental disabilities) and also [the] Christmas in July food drive which raises food and money for the St. Jude food bank that is distributed to needy families in town." (D. & R. Lane Ltr.; *see also* A. & M. Bonomo Ltr. ("He is also a member of the Knights of Columbus, a society of Catholic men who do charitable works to raise the dignity of the homeless by providing food and clothing for the poor, visiting the mentally challenged in hospitals and nursing homes and providing assistance to those less fortunate. Ed has participated with us in many charitable works.")).

- *Feed the People's Relief Program* – Feed the People's Relief Program provides food to those in need. Families from St. Jude who participate pick up discarded food from various

---

[6] By way of example, Mr. DiMaria "has consistently provided financial support and prayers" to Sister Megan Mary Thibodeau and "[h]is donations always come out of the blue." (Sr. M. Thibodeau Ltr.). Sister Megan's mother, Bonnie, is grateful to Mr. DiMaria for his financial assistance to her daughter finding it "such a blessing, as her mother, to know that people like Ed are willing to financially assist her in her work with the poor and marginalized." (B. Thibodeau Ltr.).

participating businesses in town to fill the back of an SUV and bring it to different relief organizations around Bridgeport, CT.  The organizations cater to many different populations; some are faith based, one services veterans, some are organizations to assist people suffering from drug addiction.  The DiMarias were responsible for a weekly pick-up.  A friend, Danielle Maslar, remembers being surprised to learn of their weekly routine after years of friendship with the DiMarias; she "only learned [about their involvement] when a new bakery came to town and a mutual friend mentioned maybe [the bakery] would be willing to donate their day old bread as well."  It was the friend who then mentioned the DiMarias' humble participation.  (D. & S. Maslar Ltr.).[7]  One of the organizations to which they provide food is "Home of the Brave," a relief organization for homeless veterans.  When he drops food at Home of the Brave Mr. DiMaria "does not just [leave it and] run, he takes time to talk with the Veterans and he makes a point to get to know them . . . through their often-tragic stories."  (J. Uhl Ltr.).

- **Blessed Sacrament Food Pantry** – Blessed Sacrament Food Pantry in Bridgeport, Connecticut is "a community outreach program that helps provide food and other small household items to well over 300 families."  The Director of the program, Ann LeStrange, explains how "Ed has been at the Food Pantry countless times dropping off donations," always "quick to lend a hand for projects . . . [such as on the] day before Thanksgiving [when they] have an event called the 'food pack.' [They] pack bags of food and bring them over to the food pantry.  It's a crazy day.  Ed was a big help, both packing bags of food and helping to carry the heavy bins full of the food packs as [they] brought them from the packing point to their final destination."  (A. LeStrange Ltr.).

- **Other Charity Programs** – The DiMarias also participated in other charity programs and appeals for assistance through their church.  For example, Danielle Maslar recalls how "Father Skip used to take some of the older kids and adults to deliver socks and other items to homeless shelters.  Ed and Cindy would go and help.  [She] remember[s] going with them one time and it wasn't the easiest environment and [she] saw how comfortable Ed and Cindy were there.  They always felt like everyone needed to be taken care of."  (D. & S. Maslar Ltr.; *see also* Fr. Skip Ltr. (The DiMaria family's "willingness to work has led them to offer labor-intense service for our [inner city] population and needy poor.  Faith and friendship continue to bring them here, to a neighborhood that many do not know even exists, and many fearfully avoid."); G. Burdo Ltr. ("A few months back he was in my warehouse hustling up some mattresses for a homeless family in Bridgeport, Ct. that was moving into an apartment.  He packed a pick-up truck himself and delivered them. This is not an aberration but who Ed is and who he has raised his children to be.")).

---

[7] Victor Eng recalls an "instance when Ed received a call from a former priest from our parish" who had been reassigned to an inner city church and "urgently needed a number of carloads of food to be picked up . . . quickly sorted, and delivered to . . . families in need in time for the holiday.  Ed immediately dropped what he was doing and responded to the request, even though he was having shoulder pain at the time.  He enlisted his wife and children to assist and made multiple trips to complete the deliveries in time.  This instance was a typical response for Ed . . . ."  (V. Eng. Ltr.).

*Church Administration*

- ***The Annual Catholic Appeal*** – Mr. DiMaria and his wife were asked to co-chair the 2015 Annual Bishops Appeal.[8]  When a family friend asked him why he would "want to make such a huge commitment, co-chairing the drive, [Mr. DiMaria] responded, 'it is an honor.  It is a great way to show my devotion to the parish, to the pastor and to my faith.'"  (D. Feneley Ltr.).  "Every year all parishes within the Diocese of Bridgeport raise funds to support a variety of Diocesan organizations."  (S. Verespej Ltr.).  The DiMarias gave a number of presentations, including a kick-off presentation, a mid-way appeal, and a final push, as well as a wrap-up presentation on the results at all five of the Sunday services.  They also did some tabling with sign-ups and posters and information about the program.  "Ed and Cindy helped encourage parishioners to achieve [the] fundraising goal, which [they] not only met, but exceeded!"  (S. Verespej Ltr.).

- ***Extraordinary Ministers of the Eucharist*** – Father Michael Novojosky invited Mr. DiMaria to serve as an Extraordinary Minister of the Eucharist, delivering communion during mass on Sundays.  "Ed had to receive special spiritual, theological, and practical preparation to allow him to fulfill his role with knowledge and reverence."  (Dcn. Tuccio Ltr.).  The DiMarias have been part of a rotating schedule for the past eight years, which typically requires ministers to serve during "[two] Masses a month."  (M. & W. Rauser Ltr.).

- ***Church Fundraisers*** – The DiMarias "are always involved in activities and events within [their] parish . . . quietly work[ing] in the background to ensure the success of every event, whether it is setting up tables and chairs or cleaning up."  (V. Eng. Ltr.).  For example, St. Jude's sells Christmas wreaths as an annual fundraiser; "[a] committee including Ed spearheaded the sale."  (D. & R. Lane).  Friends recount how, much like his involvement in other ministries, Mr. DiMaria was always willing to step up when needed.  For example, one year an issue "arose with the delivery of the wreaths" and Mr. DiMaria took it upon himself to pick up the wreaths and to get everything set up for the fundraiser.  When it was over and there were leftover wreaths that hadn't been sold, "Ed purchased the balance . . . and delivered [them] to the residents of Fairway Acres, a Senior Citizen's low-income housing development . . . so the residents could decorate their doors for Christmas."  (D. & R. Lane Ltr.; *see also* D. & S. Maslar Ltr.).[9]

---

[8] The Diocese of Bridgeport featured an article with Mr. DiMaria and Cindy discussing their work as the co-chairs for their parish.  *See Cindy and Edward DiMaria from St. Jude in Monroe explain how their role honors and serves Christ*, Diocese of Bridgeport, https://www.bridgeportdiocese.org/aca/cindy-and-edward-dimaria-from-st-jude-parish-in-monroe-explain-how-their-role-honors-and-serves-christ/.

[9] *See also* D. & R. Lane Ltr. ("If the Church or one of the ministries need any assistance, Ed is always there to lend a helping hand.  Many hot August nights were spent with Ed working the kitchen at our Church's Italian Festival as a food runner.  Not only is the weather hot, but working in the kitchen tent running around gathering food for the customers is extremely hot.  Ed volunteered in this capacity . . . with a smile on his face and a kind word to each person.").

- ***Parish Finance Council President*** – Mr. DiMaria was asked to serve in the role of Parish Finance Council President.  Mr. DiMaria's responsibilities consisted of attending and reporting back at formal quarterly meetings and making presentations at Mass.

As his fellow parishioner Sue Verespej summarized best: "[Ed] has served the Church, its members, and the Emmaus Community through his generous gift of time and sacrifice.  Over the past nine years, I have never heard Ed speak a negative comment, complain, or ask for anything in return for the service he so graciously gave to God's work."  (S. Verespej Ltr.)

\* \* \*

Through a long six years in which Mr. DiMaria "completely lost his career, his dignity, his immaculate reputation  . . . he still gets up every day . . . attends Mass, prays and works very hard at what needs to be done.  He remains steadfast in his faith, his love of friends, family and community."  (Cindy DiMaria Ltr.).  His friends, family and community remain steadfast in their support for him.

Over 150 people have sent letters representing all phases of Mr. DiMaria's life.  They come from all aspects of his life, from childhood friends, to neighbors, to fellow parishioners, to his children's friends, to work colleagues, to family.  They each offer a sincere tribute, profound in context, and remain proud to call him their friend.  (*See* J. Cardi Ltr. ("I am writing this letter of character reference for my good friend, Ed DiMaria, from my father's Hospital bedside in New York. There aren't many people I would do this for at such a time, but Ed is certainly one of them."); D. Ross Ltr. ("I feel proud to count him as a close friend and previous colleague."); D. & R. Lane Ltr. ("Our lives are enriched with having known Ed."); S. DiCairano Ltr. ("I am writing this character reference letter for Edward DiMaria with sincere admiration and respect for a man who I have been proud to know for almost 30 years); M. & W. Rauser Ltr. ("He is a man of great compassion and we are honored to call him our friend."); G. Mangini Ltr. ("He is

27

my role model, and I am so fiercely proud to be his niece."); C. Buckley Ltr. ("I would be a

poorer person for not knowing him, and I am thankful every day that I do."); R. Beauchamp Ltr.

("I feel a deep sense of gratitude towards Ed and the entire DiMaria family"); M. Rossi Ltr. ("I

am eternally grateful for having Ed in my life."); L. DiMaria Ltr. ("I am proud to call Ed my

brother in law, but more importantly, I am so honored that he is my friend."); G. Burdo Ltr. ("I

got married and I thought of no one else that I wanted to stand next to me during the most

important day of my life than Ed DiMaria.  He was my best man then and is now.")).

The letters on Mr. DiMaria's behalf ask for leniency for a man who strives to be the best

husband, father, neighbor and parishioner that he can be.

## II.    CIVIL PENALTIES AND SUBSEQUENT CRIMINAL ACTION

In August 2012, the U.S. Securities and Exchange Commission ("SEC") began

investigating Bankrate's accounting practices.  The SEC's investigation was extensive and

spanned over three years.  Bankrate simultaneously conducted two internal investigations, as did

Bankrate's independent auditor.  During the pendency of these investigations, Mr. DiMaria did

not receive a bonus.  He was demoted from his position of Chief Financial Officer to Senior Vice

President, and in October 2014, he was ultimately terminated by the Company as a result of the

investigation.

After three years of investigation, the SEC filed a civil enforcement action against Mr.

DiMaria in September 2015.  Complaint, *SEC v. DiMaria*, 15-cv-07035-GHW (S.D.N.Y. Sept.

8, 2015), DE 1.  He settled this action and agreed to pay a $187,472 civil money penalty,

$6,214.56 in prejudgment interest, and $37,472 in disgorgement.  Final Judgment, *DiMaria*, 15-

cv-07035-GHW (S.D.N.Y. Aug. 16, 2017), DE 87.  The disgorgement figure represented Mr.

DiMaria's incremental profit from selling Bankrate stock at a price that was inflated based on the

28

at-issue accounting entries.  As part of the settlement, Mr. DiMaria also lost his livelihood as he agreed to a five-year suspension from serving as an officer or director of a public company.

The Department of Justice conducted its own investigation into Bankrate's accounting. To our knowledge, that investigation began in 2014, if not earlier, yet Mr. DiMaria was not charged until December 19, 2017.  Mr. DiMaria entered a guilty plea before Chief Magistrate Judge Andrea M. Simonton on June 28, 2018.  The plea was accepted by the Court on July 17, 2018.

## III.   APPLICATION OF THE 18 U.S.C. § 3553(A) FACTORS WARRANTS A VARIANCE FROM THE GUIDELINES

With its decision in *United States v. Booker*, the Supreme Court rendered advisory the once-binding Sentencing Guidelines and empowered district courts to take full account of the sentencing factors set forth in 18 U.S.C. § 3553(a).  *See United States v. Booker*, 543 U.S. 220, 259 (2005).  The Guidelines are merely a "starting point" and "initial benchmark" for a sentencing determination.  *United States v. Matchett*, 802 F.3d 1185, 1194 (11th Cir. 2015) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)).  Section 3553(a) instructs sentencing courts to take a holistic approach to sentencing, requiring the Court to consider (1) "the history and characteristics of the defendant"; (2) "the nature and circumstances of the offense"; (3) the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; (4) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and (5) the need "to afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(1)-(7).  The statute's overarching requirement is that the Court "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing.  *Id.* § 3553(a).  In other words, the Court

must make an "individualized assessment" of all of the facts and circumstances and "may not presume that the Guidelines range is reasonable." *Gall*, 552 U.S. at 50.

As set forth in the Plea Agreement and outlined in the Presentence Investigation Report, Mr. DiMaria's adjusted offense level is 37, corresponding to an advisory Guidelines range of 210 to 262 months.  Plea Agreement, DE 68.  However, because Mr. DiMaria pleaded guilty to two criminal counts that each carry a maximum sentence of five years, the maximum sentence that may be imposed is 10 years.  Pursuant to U.S.S.G. § 5G1.1, the applicable Guideline sentence is, therefore 120 months.  Although as part of the plea agreement the defendant agreed to this Guideline calculation, the plea agreement expressly allows the defense to seek a downward variance under 18 U.S.C. § 3553(a).  For the reasons set forth below, we respectfully submit that a variance is warranted here.

As many judges have recognized, the Guidelines "do not present a reasonable starting point for sentencing" in certain kinds of white-collar cases.  *Calkins v. United States*, 795 F.3d 896, 903 n.8 (8th Cir. 2015) (Bright, J., dissenting) (internal citation omitted); *see also United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013), *as corrected* (July 24, 2013) (Underhill, J., concurring) (commenting that the Sentencing Guidelines for white-collar cases are "broken" and leave sentencing courts "without meaningful guidance"); Sentencing Hr'g Tr. 43:22-44:8, *United States v. Gordon*, No. 4:09-cr-00013-JHP (N.D. Okla. Oct. 29, 2010) (noting that the fraud Guidelines have "so run amuck that they are patently absurd on their face").  The fraud Guidelines frequently produce excessive sentences, leading courts to characterize the Guidelines as "ridiculous, absurd, [and] barbaric," Sentencing Hr'g Tr. 27:24-28:11, *United States v. Lumiere*, No. 16-cr-00483 (S.D.N.Y. June 14, 2017) , DE 115, "patently absurd on their face,"

*United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), and a "black stain on

common sense," *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008).

One significant shortcoming of the Guidelines as applied to fraud cases is that they reflect

a one-size-fits-all solution and do "not offer . . .  meaningful guidance for differentiating between

and among financial criminals and accurately gauging their relative culpability."  Sentencing

Commission Pub. Hr'g Comments of Preet Bharara at 11 (Feb. 16, 2011),

https://www.ussc.gov/sites/default /files/Hearing_Transcript_2.pdf.  "There are cases in which,

in Ponzi schemes for example, the defendant has personally pocketed funds, in addition to

causing loss to victims that come out of the victims' pockets" and there are "other kinds of cases,

accounting fraud cases, [where] it is sometimes the case that the defendant was perpetrating a

fraud for the benefit of the company and no personal gain directly accrued to that defendant,"

and, despite the stark difference in terms of the defendants' culpability, the Guidelines treat these

cases as the same.  *Id.* at 45-46.

Recognizing that the Guidelines do not produce an appropriate sentence in every

financial fraud case, the Eleventh Circuit Court of Appeals has on several occasions affirmed

below-Guidelines sentences over the Government's objection that the sentence imposed was too

lenient.  *See, e.g.*, *United States v. Anderson*, 267 F. App'x 847, 850-51 (11th Cir. 2008) (per

curiam) (upholding probationary sentence in insider trading case); *United States v. Montgomery*,

165 F. App'x 840, 843 (11th Cir. 2006) (per curiam) (upholding below-Guidelines sentence of

eight months in bank fraud case); *United States v. Vawter*, 167 F. App'x 101, 103 (11th Cir.

2006) (per curiam) (affirming below-Guidelines sentence of six months in bank fraud case).

The harsh penalties associated with the fraud Guidelines are largely a result of the loss

enhancement table, yet the numbers in the table are arbitrary as they "do not result from any

reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime." *United States v. Johnson*, No. 16-cr-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (noting that "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice"), *aff'd*, 747 F.3d 111 (2d Cir. 2014); *United States v. Spencer*, 700 F.3d 317, 325 (8th Cir. 2012) (Bright, J., dissenting as to defendant's sentence) ("Adjustments based on the amount of loss lead to astronomical sentences that have little connection to criminality."); *cf. United States v. Faibish*, No. 12-cr-265 (ENV), 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) (noting that the loss table "is but one example of the seemingly mindless acceleration of penalties for economic crimes").

In accounting fraud cases, the severe impact of the loss table is combined with other broadly applicable specific offense enhancements, causing a "'piling-on' of points for which the guidelines have been frequently criticized." *Adelson*, 441 F. Supp. 2d at 510. These enhancements—for the number of victims, "sophisticated means," being an officer or director— are mechanically applied in nearly every securities fraud case. *See Parris*, 573 F. Supp. 2d at 755 (disagreeing with this "'one-shoe-fits-all' approach"). These enhancements boost the offense level to heights that apply to the worst and most violent offenses in the criminal code.

It should not be the case, as it is here, that the penalty for misleading an auditor about the size of expense accrual estimates is greater than the penalty would be for assaulting that same auditor with intent to commit murder (which has a base offense level of 27 under U.S.S.G. § 2A2.1(a)(2)). Similarly, Mr. DiMaria's Guidelines would be lower if he had robbed Bankrate's

offices and stolen $21 million in cash from the company's vault (meriting an offense level of 27 under U.S.S.G. §§ 2B3.1(a), (b)(7)).   If during that hypothetical robbery Mr. DiMaria shot someone with a firearm (add seven points) and caused a life threatening injury (add six more points), the total offense level would reach 40 – the same level assigned to Mr. DiMaria's conduct here.

We respectfully submit that this is a case where the Guidelines call for a sentence that is far greater than merited based on the application of the Section 3553(a) factors and that a substantial variance, resulting in a sentence of substantially less than 120 months, is warranted.

### A.  The History and Characteristics of the Defendant

Sentencing courts should "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 113 (1996); *see also e.g.*, *Pepper v. United States*, 562 U.S. 476, 487 (2011) (citing *Koon*, 518 U.S. at 113).  We respectfully ask that the Court consider the facts and circumstances of this case and evaluate Mr. DiMaria's conduct at issue in the context of his otherwise law-abiding life.[10]  As set forth in detail above, Mr. DiMaria's life has been characterized by hard work and devotion to his family and his faith.  This is manifest in his three compassionate children, his enduring marriage of twenty-seven years, and his numerous acts of service to his community and his church.

---

[10] Paragraph 71 of the PSR reflects that Mr. DiMaria pleaded guilty and received a conditional discharge for misdemeanor petty larceny when he was 18 years old.  Mr. DiMaria was working at a Sears store and allowed another employee to exchange an old car battery, which was no longer under warranty, for a new battery.  Despite immediately confessing when confronted by a supervisor at the store, the matter was referred to the police.  This indiscretion in Mr. DiMaria's teenage years does not result in any criminal history points under the Guidelines.

KL3 3181583.1

### B.  The Offense Conduct

As the Eleventh Circuit has recognized, "fraudulent schemes . . . come in various forms." *United States v. Orton*, 73 F.3d 331, 333 (11th Cir. 1996).  They fall along a spectrum in terms of the harm the perpetrators cause, or intend to cause: "[A]t one end of the scale [is] theft-like fraud where the perpetrator intends to keep the entire amount fraudulently obtained.  On the other end of the scale [is] contract fraud where the perpetrator, while fraudulently obtaining the contract, intends to perform the contract and to cause no loss to the victim."  *Id.* at 334 (footnote omitted).  The offense conduct at issue here did not involve the most serious type of fraud, *i.e.* theft-like fraud.  Quite the opposite.  The conduct at issue here—management of corporate earnings—is a longstanding practice that is generally motivated by corporate executives' belief that the company and its shareholders will all be made better off, at least in the short term, if corporate results are tweaked at the margins so as to be closer to the expectations of Wall Street analysts and investors.  The fact that earnings management does not involve the intentional infliction of harm does not make it legal, but it distinguishes this form of unlawful conduct from others that are rooted in much more destructive impulses.

The gravamen of the criminal conduct in this case is making adjustments to expense accrual estimates to affect the level of Adjusted EBITDA, a non-GAAP earnings metric that Bankrate reported quarterly, and not being forthcoming with Bankrate's auditors about how these accruals were being calculated and maintained.  There were also instances in which revenue was recognized prematurely and without adequate support.  This shifting of expenses and revenue had the effect of increasing Adjusted EBITDA in some quarters and decreasing Adjusted EBITDA in other quarters in order to meet, or just get closer to, analyst expectations.  Mr. DiMaria was charged, for example, with booking additional expenses in Q4 2011 in order to decrease earnings for the quarter.  Analysts estimated that Bankrate's Adjusted EBITDA would

34

be approximately $33.6 million for Q4 2011.  The Company reported Adjusted EBITDA of
$38.5 million, beating analyst expectations by a wide margin.  That margin would have been
slightly wider but for Mr. DiMaria's conduct.  Similarly, reserves that were booked in Q4 2011
were reversed in Q1 2012, which increased earnings in that later quarter.  Analysts predicted that
Bankrate's Adjusted EBITDA for Q1 2012 would be approximately $39.8 million.  The
Company missed expectations and reported $37.8 million in Adjusted EBITDA.  Again, the
difference would have been slightly greater but for certain improper adjustments.  In Q2 2012,
Bankrate reported Adjusted EBITDA of $37.5 million, slightly exceeding the analysts'
consensus of $37.2, but the figure would have come in lower but for certain unsupported
adjustments.

    The offense conduct in this case is readily distinguishable from the most egregious fraud
cases where individuals have stolen for the sole purpose of enriching themselves.  This case
bears no resemblance to *United States v. Schwarz*, No. 4:16-cr-10039-KMM (S.D. Fla.), for
example, where, as Your Honor knows, the defendant ran a Ponzi scheme, defrauding 1,400
victims of approximately $303 million to fund his lavish jet-setting lifestyle.  In that case, Your
Honor sentenced the defendant to forty years in prison.  Nor does this case bear any resemblance
to *United States v. Valladares*, No. 07-cr-20355-KMM (S.D. Fla.), another case over which Your
Honor presided, where the defendant bribed Medicare beneficiaries and doctors to obtain
unnecessary prescriptions so she could give those prescriptions to pharmacies in exchange for
kickbacks and the pharmacies could submit fraudulent reimbursement claims to Medicare.  This
Court sentenced Ms. Valladares to ten years in prison.

    This case is also nothing like the notable accounting scandals of the past, such as Enron
and WorldCom.  Unlike the most egregious accounting fraud cases, where the improper

adjustments masked the true financial condition of a failing company, the adjustments at issue in this case affected Bankrate's reported Adjusted EBITDA by only a few percentage points. They constituted a tiny percentage of total top-line revenue and an even smaller percentage of the company's overall value. During the relevant time period, Bankrate had approximately $1.2 billion in assets on the balance sheet; the adjustments at issue in any particular quarter totaled no more than one or two tenths of one percent of that amount.

This case, which involves incremental smoothing of earnings, is therefore completely different from the typical financial crime, or even the typical criminal accounting fraud case. It cannot be said that Bankrate's business was vastly different than its reported results. Relatedly, the disclosure of the fraud did not put the company out of business or in financial distress. Bankrate was, at the time of the offense conduct, and still is a legitimate business with real profits. When Mr. DiMaria began working at Bankrate in 2006, it was a small public company valued at approximately $600 million.[11] In 2009, a private equity firm acquired Bankrate in a deal valued at approximately $571 million.[12] The Company then grew through a series of acquisitions and went public again in June 2011.[13] That summer, the company's stock was trading with a market capitalization of approximately $1.4 billion.[14] That was approximately the market capitalization of the company in September 2014, just before Bankrate announced to the public that the SEC was investigating the Company's accounting practices.[15] Although the

---

[11] Kiplinger.com, *Bankrate: Raising Interest* (June 8, 2006), https://www.kiplinger.com/article/investing/T038-C008-S001-bankrate-raising-interest.html.
[12] Press Release, Apax Partners, *Bankrate, Inc. agrees to be acquired by Apax Partners for $28.50 per share in cash* (July 22, 2009), http://www.apax.com/news/press-releases/2009/july/bankrate,-inc-agrees-to-be-acquired-by-apax-partners-for-$2850-per-share-in-cash/.
[13] Bankrate, Amendment No. 4 to Form S-1 Registration Statement, dated June 14, 2011.
[14] S&P Capital IQ: Bankrate, Inc. – Market Capitalization.
[15] *Id.*

KL3 3181583.1

specter of an investigation clearly unnerved shareholders, when the Company completed its investigation and released its restated financials, the results were far more reassuring. Measured across all periods, the restatement had no appreciable impact on revenue and affected Adjusted EBITDA by only a few percentage points.[16] In mid-2017, a private company, Red Ventures, purchased Bankrate in a go-private transaction that valued Bankrate at approximately $1.4 billion.[17] In other words, Bankrate is and always was a real and stable company, not a house of cards built on accounting gimmicks and phony profits. Mr. DiMaria, through hard work having nothing to do with the offense conduct, helped create hundreds of millions of dollars in real value for Bankrate's investors, helped build a company that employs hundreds of people, and helped create a set of online products and services that millions of consumers find useful every year. These factors do not justify Mr. DiMaria's conduct, but they distinguish it from other forms of financial crimes in ways that are not recognized at all by the Sentencing Guidelines.

### C.  A Variance Will Avoid Unwarranted Sentencing Disparities

Sentencing courts are required to consider the need to avoid unwarranted sentencing disparities. *United States v. Croteau*, 819 F.3d 1293, 1309 (11th Cir. 2016) (citing 18 U.S.C. § 3553(a)), *cert. denied*, 137 S. Ct. 254 (2016). The key to this analysis is finding cases that are the most comparable to the case before the Court. In our review of all federal accounting fraud cases, we have found only two criminal cases that, we submit, involve conduct that can meaningfully be compared to Mr. DiMaria's: *United States v. Block*, No. 1:16-cr-00595-JPO (S.D.N.Y.), and *United States v. Kipp*, No. 3:15-cr-00244-MOC-DSC (W.D.N.C.). Both cases involved charges of accounting adjustments to meet earnings targets. The defendants in both cases were convicted at their respective trials and sentenced within the past year. Accordingly,

---

[16] Bankrate Form 10-K for the Fiscal Year Ending December 31, 2014.

[17] Press Release, Red Ventures, *Bankrate to Be Acquired by Red Ventures for $14.00 per Share* (July 3, 2017), https://www.redventures.com/media/red-ventures-to-acquire-bankrate.html.

we respectfully submit that these two cases provide useful benchmarks in the Court's

consideration of the appropriate sentence for Mr. DiMaria.

In *United States v. Block*, Brian Block, the former chief financial officer of a publicly

traded real estate investment trust known as American Realty Capital Properties, Inc. ("ARCP"),

was found guilty after a jury trial of manipulating adjusted funds from operations ("AFFO"), a

non-GAAP metric reported by ARCP, as well as ARCP's weighted average share count, in order

to meet publically announced guidance.  Gov't Sentencing Mem. at 2-3, *United States v. Block*,

No. 1:16-cr-00595-JPO (S.D.N.Y. Oct. 26, 2017), DE 157.  The offense conduct caused AFFO

to be inflated by $13 million and AFFO per share to be overstated by approximately 5% for

fiscal year 2014.  Indictment at 13, *Block*, DE 1.

With respect to the Sentencing Guidelines, the Government argued that Mr. Block's base

offense level was 7 and that after enhancements, including a 28-level enhancement based on a

loss calculation of $315 million,[18] his total offense level was 45.  Gov't Sentencing Mem. at 9-

20, *Block*.  Block's Guidelines range was therefore life imprisonment, capped by the statutory

maximum of 105 years.  *Id.* at 20.  The U.S. Probation Department recommended a below-

Guidelines sentence of 84 months' imprisonment, which the Government largely adopted as its

own recommendation, arguing for a sentence of "*at least* 84 months' imprisonment."  *Id.* at 1.

---

[18] The Government calculated the loss amount of $315 million based on an "AFFO multiple valuation methodology."  Gov't Sentencing Mem. at 13, *Block*.  It used the analyst consensus price-to-expected AFFO multiple at the time the fraud was disclosed "to determine how the market valued the 2014 AFFO per share that ARCP was expected to generate."  *Id.* at 14.  It concluded that "the market was ascribing $0.116 of value per share to each $0.01 of expected 2014 AFFO per share" and, accordingly, "the defendant's fabricated $0.03 of AFFO per share . . . was valued by the market at the time the fraud was disclosed at $0.347 per share, or over $315,000,000 in total."  *Id.*  According to the Government, $315 million is "roughly 10 percent of the relevant market drop triggered when ARCP disclosed Block's fraud."  *Id.* at 10.

KL3 3181583.1

The sentencing court rejected the Government's loss calculation and declined to apply any enhancement for loss under U.S.S.G. § 2B1.1.  Sentencing Hr'g Tr. 35:2-39:17, *Block*, No. 1:16-cr-00595-JPO (S.D.N.Y. Nov. 8, 2017), DE 169.  The court explained that determining loss would "require a degree of speculation and assumption on [the court's] part" and that even if it could quantify the loss and the Guidelines were life imprisonment, "[t]he idea that this criminal conduct warrants life or 105 years is absurd and simply highlights how broken the guidelines are with respect to being arbitrarily driven by factors that happen to be quantifiable: Loss amount in financial cases or drug amounts in narcotics cases, to the exclusion of considerations that actually go to a defendant's culpability." *Id.* at 39:11-17; 71:3-13.

After considering the factors set forth in 18 U.S.C. § 3553(a), the court sentenced Mr. Block to 18 months in prison.  *Id.* at 41:9-14; 71:23-72:5.  In explaining the sentence, the court noted there were a number of mitigating factors, including the fact that Mr. Block had no criminal record, is a "good father and a good family member and friend," and "had a genuinely positive effect on many people in his life." *Id.* at 69:11-19.  The court emphasized that "the fact of a felony conviction and the presumed inability of the defendant to maintain his profession is significant punishment in [and of] itself." *Id.* at 70:13-16.  Finally, the court explained that the 84-month sentence recommended by the Government and Probation was "excessive" in view of the Section 3553(a) factors, "including the purpose of general deterrence." *Id.* at 71:14-18.

In *United States v. Kipp*, Michael Kipp, the former chief financial officer of Swisher Hygiene, Inc. ("Swisher"), was convicted after a bench trial of manipulating Swisher's accounting to hit Adjusted EBITDA targets and making false statements to Swisher's auditors. *See* Mem. of Decision and Verdict, *United States v. Kipp*, No. 3:15-cr-00244-MOC-DSC (W.D.N.C. June 20, 2017), DE 196.  The court found that the offense conduct caused Adjusted

EBITDA to be inflated by approximately 20% in the second quarter of 2011 and 12% in the third quarter of 2011.  *Id.* at 13, 18.  The court also found that Mr. Kipp and others also attempted to manipulate Swisher's fourth quarter and year-end 2011 results but the fraud was uncovered before they filed false reports for those periods.  *Id.* at 4.

The sentencing court determined that Mr. Kipp's total offense level was 45 (reduced to the highest level of 43) and his resulting Guidelines range was life imprisonment, capped by the statutory maximum of 900 months' imprisonment.  *See* Redacted Sentencing Hr'g Tr. 180:10-22, *Kipp*, No. 3:15-cr-00244-MOC-DSC (W.D.N.C. Apr. 10, 2018), DE 251.  Mr. Kipp's Guidelines calculation included a 24-level enhancement based on a loss figure of $95 million.[19]  *Id.* at 158:11-16.  The Government recommended a below-Guidelines but, in its words, a "heavy sentence" of 144 months, representing an approximately 86% downward variance from the statutory maximum.  Gov't Sentencing Mem. at 6, *Kipp*, No. 3:15-cr-00244-MOC-DSC (W.D.N.C. Apr. 4, 2018), DE 240.

After considering the Section 3553(a) factors, the court imposed a sentence of 54-months' imprisonment.  Redacted Sentencing Hr'g Tr. 220:24-221:7, *Kipp*.  The court acknowledged that the offense conduct was serious and that there was a need to deter others from engaging in similar conduct.  *Id.* at 207:17-24.  The court also noted that Mr. Kipp's conduct –

---

[19] The Government retained an expert who conducted an event study to determine what portion of the drop in Swisher stock price following the disclosure of the fraud was attributable to the disclosure of Defendant's fraud.  Gov't Sentencing Mem. at 6, *Kipp*, No. 3:15-cr-00244-MOC-DSC (W.D.N.C. Apr. 4, 2018), DE 240.  Although the court ultimately applied the loss enhancement that the Government argued for, it expressed skepticism about the loss amount: "I recognize also that the reality of this, it's not like [Kipp] went out and got $95 million from anybody.  In fact, anybody that did not take their -- sell their stock that day would get some of that back and possibly back up past there if they stayed with the stock. So the losses are not -- we don't have a bunch of people clamoring with losses as a result of that. . . .The Court recognizes that and that will go into the Court's consideration during sentencing."  Redacted Sentencing Hr'g Tr. at 158:17-25.

KL3 3181583.1

unlike Mr. DiMaria's – had endangered the solvency and financial security of the company.  *Id.* at 171:12-24.  It balanced these facts against the fact that Mr. Kipp was a 63-year-old non-violent offender who had otherwise "lived an exemplary life."  *Id.* at 203:2-13, 207:7-16, 208:8-209:2.  The court agreed with defense counsel that a 10-or 12-year sentence, the Government's recommendation, would essentially be a life sentence for Mr. Kipp.  *Id.* at 212:14-24.  Moreover, the court noted that Mr. Kipp had already suffered as he had lost his job and reputation and had paid a significant financial penalty.  *Id.* at 205:6-10.  Finally, it added that "[t]he amount of loss [was] high, but the amount of personal gain to t[he] defendant [was] relativity low."  *Id.* at 207:25-208:4.

The sentencing courts in *Block* and *Kipp* wrestled with how to fashion a sentence in the absence of meaningful guidance from the Sentencing Guidelines.  These courts ultimately considered the case-specific facts, distinguished between earnings management and other kinds of fraud, and devised sentences that they found were sufficient but not longer than necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

We respectfully submit that a substantial downward variance would avoid unwarranted sentencing disparities among similarly situated defendants like Mr. Block who received an 18-month sentence and Mr. Kipp who was sentenced to 54 months in prison.[20]  Like Mr. Block and

---

[20] There are other accounting fraud cases in which defendants received lengthy sentences but those cases included far more aggravated facts.  For example, in *United States v. Rand*, No. 10-cr-182-RJC-DSC (W.D.N.C.), the former Chief Accounting Officer of Beazer Homes USA, Inc. ("Beazer"), was convicted at trial and sentenced to 120 months in prison.  Press Release, Dep't of Justice, Federal Judge Hands Down 10-Year Sentence to Former Chief Accounting Officer for Beazer Homes USA, Inc. (Apr. 30, 2015), https://www.justice.gov/usao-wdnc/pr/federal-judge-hands-down-10-year-sentence-former-chief-accounting-officer-beazer-homes.  Mr. Rand participated in an accounting fraud scheme that spanned seven years.  *Id.*  He caused Beazer's reported earnings in fiscal year 2006 to be fraudulently inflated by over $40 million, representing over 6% of Beazer's reported income before taxes.  Gov't Opp'n to Def. Mot. for J. of Acquittal at 18, No. 3:10-cr-00182-RJC-DSC (W.D.N.C. Aug. 11, 2014), DE 363.  He was also found

41

Mr. Kipp, Mr. DiMaria is a non-violent offender who has otherwise led an exemplary life.  He was charged with making small adjustments to meet earnings targets.  His conduct did not cause Bankrate to grossly misrepresent its earnings.  His personal gain from the offense conduct is drastically lower than the loss amount ascribed to his offense.  Moreover, Mr. Block and Mr. Kipp were each convicted after trial rather than pleading guilty and therefore, unlike Mr. DiMaria, were not entitled to a 3-level credit for acceptance of responsibility.  *See* Mem. of Decision and Verdict, *Kipp*; Sentencing Hr'g Tr. at 2:10-15, *Block*.  Mr. Block even testified in his own defense and the sentencing court found that he testified falsely concerning "material matters."  Sentencing Hr'g Tr. 40:19-41:8, *Block*.  On this basis alone, Mr. Block's offense level included five levels of enhancements not applicable to Mr. DiMaria.  If this Court were to sentence Mr. DiMaria to the statutory maximum of 120 months in prison, his sentence would be almost seven times longer than Mr. Block's and more than twice as long as Mr. Kipp's sentence.

In fashioning the appropriate sentence for Mr. DiMaria, it is also appropriate to consider the sentence that this Court imposed on Hyunjin Lerner, who was Mr. DiMaria's subordinate.

---

guilty of three counts of obstructing justice.  *United States v. Rand*, 835 F.3d 451, 459 (4th Cir. 2016) (affirming conviction and sentence).  Mr. Rand deleted nearly 6,000 emails to cover up his fraud.  *Id.* at 457.

Another example of an accounting fraud case involving far more aggravated conduct is *United States v. Baker*, No. 13-cr-346-SS (W.D. Tex.).  Mr. Baker, the Chief Executive Officer of ArthroCare Corporation ("ArthroCare"), was convicted at trial and sentenced to 240 month in prison for his role in a $750 million fraud.  Press Release, Dep't of Justice, Former CEO of Arthrocare Corporation Sentenced to 20 Years in Prison for Role in $750 Million Securities Fraud Scheme (Nov. 3, 2017), https://www.justice.gov/opa/pr/former-ceo-arthrocare-corporation-sentenced-20-years-prison-role-750-million-securities-fraud.  Among other enhancements, the sentencing court found that the fraud endangered the solvency and financial security of ArthroCare.  Sentencing Hr'g Tr. 27:10-23, *United States v. Baker*, 1:13-cr-00346-SS (W.D. Tex. Nov. 3, 2017), DE 604.  Unlike these other defendants, Mr. DiMaria chose to accept responsibility and enter a guilty plea rather than proceed to trial.  Moreover, the offense conduct in this case is far less serious, most notably because his conduct had a much smaller effect on Bankrate's reported earnings and did not endanger Bankrate's solvency or financial security.

Mr. Lerner was indicted on March 28, 2017, pleaded guilty on October 12, 2017, and was sentenced by the Court on January 11, 2018 to 60 months in prison.  It is our understanding that the Government will likely file a motion pursuant to Federal Rule of Criminal Procedure 35 for a reduction in his sentence on account of his cooperation.  We respectfully submit that the Court has considerable room to sentence Mr. DiMaria to a period of incarceration longer than Mr. Lerner's sentence (which is currently 60 months but may be further reduced) but below the maximum of 120 months.  Such a sentence would distinguish between Mr. DiMaria and Mr. Lerner based on Mr. DiMaria's higher position at Bankrate and Mr. Lerner's cooperation but would still be higher than any sentence ever meted out in an accounting case that is factually similar to this one.

Finally, in assessing sentencing parity, courts should keep in mind that many individuals engaged in conduct similar to the defendant's were not even charged criminally.  "[T]hough [we] may properly ask the district court to explain apparent sentencing anomalies among convicted defendants . . . , we should not forget that there might be even greater disparities between a defendant and other individuals who were not charged at all."  *United States v. Stewart*, 590 F.3d 93, 161-62 (2d Cir. 2009) (Calabresi, J., concurring).  To that end, there are many examples of chief financial officers of public companies, including those listed below, who engaged in earnings management akin to the charges against Mr. DiMaria and were charged by the SEC but have never faced criminal prosecution.

- James Schneider, the former CFO of Dell, Inc., was charged by the SEC with various disclosure and accounting violations.  Complaint ¶ 1, *SEC v. Dell Inc., et al.*, No. 1:10-cv-01245-RJL (D.D.C. July 22, 2010), DE 1.  From 2002 to 2006, Mr. Schneider failed to disclose to investors certain exclusivity payments that Dell received from Intel, which allowed Dell to meet its earnings targets and "misrepresented the basis for Dell's improving profitability."  *Id.* ¶ 2.  Mr. Schneider and others also maintained and used "cookie jar" reserves for over three years in order "to meet consensus earnings targets or to misstate materially important financial metrics."  *Id.* ¶¶ 4, 83, 84.  Mr. Schneider settled the action

43

with the SEC without admitting or denying the charges.  Notice of Settlement, *Dell Inc., et al.*, No. 1:10-cv-01245-RJL (D.D.C. July 21, 2017), DE 5.  The Department of Justice never brought a case against Mr. Schneider.

- Gregory Geswein, former Diebold, Inc. CFO, participated in a five-year accounting fraud scheme, whereby he and others used improper "bill-and-hold" and "cookie-jar" accounting methods to inflate the company's earnings and meet forecasts.  Press Release, U.S. Securities and Exchange Commission, *SEC Charges Diebold and Former Financial Executives With Accounting Fraud* (June 2, 2010), https://www.sec.gov/litigation/litreleases/2010/lr21543.htm.  According to the SEC, Diebold filed at least 40 annual, quarterly, and other reports with the Commission that contained material misstatements and omissions regarding the company's financial performance.  *Id.* Diebold's "improper accounting practices misstated the company's reported pre-tax earnings by at least $127 million."  *Id.* Mr. Geswein settled the action without admitting or denying the allegations.  Consent Decree, *SEC v. Geswein, et al.*, No. 5:10-cv-01235-CAB (N.D. Ohio May 26, 2015), DE 136.  He was never charged by the Department of Justice.

- Michael Mancuso, the former CFO of Computer Sciences Corp. ("CSC"), used improper accounting models to hit earnings targets and conceal from investors that CSC was having significant problems with its largest contract.  Press Release, U.S. Securities and Exchange Commission, *SEC Charges CSC and Former Executives with Accounting Fraud* (June 5, 2015), https://www.sec.gov/news/pressrelease/2015-111.html.  Mr. Mancuso settled the action without admitting or denying the allegations against him, *id.*, and was never charged criminally.

- James Crane, the former CFO of Subaye, Inc., was charged by the SEC with causing Subaye to make false public filings and misrepresentations to prospective investors in an attempt to "mask the true nature of the sham company" that had "no verifiable revenues" and lacked the proper infrastructure to support its claimed services.  Complaint ¶¶ 2, 8 39, *SEC v. Subaye, Inc., et al.*, No. 13-cv-3114-PKC (S.D.N.Y. May 8, 2013), DE 1.  Mr. Crane settled the action without admitting or denying the allegations against him.  Consent, *Subaye, et al.*, No. 13-cv-3114 (S.D.N.Y. July 17, 2014), DE 39-1.  He was never charged by the Department of Justice.

Now facing loss of his liberty, we submit that Mr. DiMaria has already been treated much more harshly than most other similarly situated individuals, who were not criminally charged.  A variance that results in a sentence below 120 months would reduce this disparity, although any sentence of incarceration will still be immeasurably harsher than the civil punishments received by other CFOs.

### D.  A Below-Guidelines Sentence Will Provide Adequate Specific and General Deterrence

The Court is required to consider both specific and general deterrence and fashion a sentence that is sufficient but not greater than necessary to "afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant."  18 U.S.C. §§ 3553(a)(2)(B) and (C).  We respectfully submit that a custodial sentence below the statutory maximum of 120 months accomplishes these objectives.

> i.  *Specific Deterrence*

The Court can have confidence that Mr. DiMaria will never again commit a crime. Pursuant to the terms of his settlement with the SEC, he is barred from working as an officer or director at a public company until 2023.  Even after than bar lifts, his conviction will make it impossible for him to get another job in corporate America.  This case has destroyed his reputation.  Mr. DiMaria will not have an opportunity to reoffend, nor does he have any desire to.  His only wish is to spend as much time as possible with his family in the remaining years of his life.

In weighing the need for specific deterrence, the Court should also consider that Mr. DiMaria is 53 years old.  Recidivism rates for individuals over the age of 50 are lower than for any other age group besides those over 60.  *See* U.S. Sentencing Commission, RECIDIVISM AMONG FEDERAL OFFENDERS: A COMPREHENSIVE OVERVIEW 23 (2016), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf; *see also United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) ("[R]ecidivism ordinarily decreases with age . . . .").  Accordingly, in considering the Section 3553(a) factors, courts have imposed below-Guidelines sentences on account of older age.  *See, e.g.*, *United States v. Gray*, 453 F.3d 1323, 1325 (11th Cir. 2006)

KL3 3181583.1

(affirming below-Guidelines sentence over the Government's objection, explaining that the sentencing court appropriately took into account the defendant's age, among other issues, in fashioning a sentence).

      ii.   *General Deterrence*

We recognize the wisdom of *United States v. Kuhlman*, 711 F.3d 1321 (11th Cir. 2013), which emphasized the importance of general deterrence in the context of white-collar crime prosecutions. White-collar criminals should not be treated leniently just because they commit economic crimes rather than street crimes. *See id.* at 1329. We simply ask the Court to consider that not all economic crimes are equally severe and to fashion a sentence that properly distinguishes this case from the most egregious fraud cases while promoting deterrence.

The facts of *Kuhlman* are far more egregious than the facts of Mr. DiMaria's case. Mr. Kuhlman, a doctor, orchestrated a health care fraud scheme whereby he brazenly billed insurance companies for services which were never performed on patients. *See id.* at 1324. He pocketed nearly $3 million from this scheme. *See id.* No portion of that money was obtained through legitimate means. The Eleventh Circuit understandably took issue with the fact that Mr. Kuhlman was originally sentenced to probation and remanded so that the district court could impose a reasonable sentence. *See id.* at 1328 (likening the punishment to a "soft pat" on the wrist). On remand, Mr. Kuhlman was sentenced to 30 months in prison. Judgment, *United States v. Kuhlman*, No. 1:11-cr-00075-MHS-1 (Mar. 3, 2014), DE 57.

The Eleventh Circuit has also explicitly recognized that a below-Guidelines sentence, even a sentence of probation, may be imposed in the appropriate case without undermining the sentencing goal of general deterrence. In *United States v. Del Campo*, the defendant, who had been found guilty of three counts of bank fraud, received a noncustodial sentence where his Guidelines range was 46 to 57 months' imprisonment. 695 F. App'x 453, 458 (11th Cir. 2017).

On appeal, the Government argued that the sentence "undermine[d] the importance of general deterrence in white collar cases." *Id.* The Eleventh Circuit disagreed and affirmed the probationary sentence. *Id.* at 458-59. In doing so, the appeals court observed that "the probability and *expected* severity of punishment" for a given offense is what provides general deterrence, rather than any specific sentence:

> [E]ven if criminals are rational actors and general deterrence worked to decrease the likelihood of criminal action by increasing the probability and severity of punishment, surely what effects general deterrence (except, perhaps, in certain high-profile cases, . . .) is the probability and *expected* severity of punishment attending a given offense, rather than the extent of an upward or downward variance in an outlier case. . . . Whether King personally receives a sentence of probation surely cannot meaningfully affect whether would-be criminals—again, assuming they act rationally in determining whether to commit crime in the first place—decide that their own potential criminal activity is worth the risk of being caught and punished.

*Id.* at 459.

Research has also shown that more rigorous and frequent enforcement and prosecution of financial crimes, rather than longer sentences, are the most effective deterrents to would-be white-collar criminals. *See* Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*, 61 Wayne L. Rev. 27, 48-49 (2015); Richard S. Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005) ("White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty."); *cf.* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest*, 17 Hofstra L. Rev. 1, 22 (1988) (noting that the Commission believed that "a short but definite period of confinement" would deter white-collar criminals).

For these reasons, we believe that any custodial sentence (in addition to the financial penalties and all of the collateral consequences that accompany a prosecution of this kind) will send a strong message of deterrence to any potential future offenders.

## IV.   FORFEITURE

Mr. DiMaria's forfeiture obligation has been satisfied in full by his payment to the SEC of $231,158.56.  *See* Plea Agreement ¶ 14.

## V.   RESTITUTION

Mr. DiMaria has agreed to pay restitution to the United States in the amount of $21,234,214.00.  *See* Plea Agreement ¶ 15.

## VI.   FINE

Probation has recommended that Mr. DiMaria not be ordered to pay a fine, as restitution is mandatory.  PSR ¶ 118.

## VII.   FEDERAL DESIGNATION

We respectfully ask that the Court recommend to the Bureau of Prisons that Mr. DiMaria be designated to serve his term of incarceration at the federal prison camp at FMC Devens, located in Massachusetts, in order to facilitate regular visitation by his parents, wife, and three children, including his minor son.  In particular, his mother, who lives in New York, is in poor health and it would be difficult for her to travel a long distance to see him.

In addition, although we understand Your Honor's practice is often to remand defendants into custody at the time of sentencing, we respectfully ask the Court to permit Mr. DiMaria to self-surrender to the designated institution or such other facility in the New England area as may be directed by the Bureau of Prisons.  We ask the Court to permit self-surrender because Mr. DiMaria is not a risk of flight and does not pose a danger to the community.  *See* 18 § U.S.C. 3143(a).  He voluntarily surrendered when he learned of the indictment and has had a blemish-

48

free history while on pre-trial supervision.  If he is remanded, he will spend a period of time of uncertain length (possibly months) in various facilities far from home, including the federal detention center in Miami, Florida and, based on our information, a network of sites used for transporting prisoners, including Tallahassee, Atlanta, Oklahoma City, and New York City.

We respectfully submit that because Mr. DiMaria and his family live very far away from this district and because Mr. DiMaria poses no danger to the community or risk of flight, it would be appropriate to permit him to return home after he is sentenced so that he can surrender directly to a facility in the Northeast where his family can more easily visit him.

## VIII.    CONCLUSION

For the foregoing reasons, Mr. DiMaria respectfully submits that a sentence below 120 months is more than sufficient to accomplish the purposes of sentencing under the analysis required by 18 U.S.C. § 3553(a).

Dated: September 12, 2018                    Respectfully Submitted,

Kobre & Kim LLP
201 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone:  (305) 967-6100

/s/ Robert T. Watson
Robert T. Watson
Florida Bar No. 679429
robert.watson@kobrekim.com

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 715-9100

/s/ Barry H. Berke
Barry H. Berke
Paul H. Schoeman
Admitted Pro Hac Vice
bberke@kramerlevin.com
pschoeman@kramerlevin.com

KL3 3181583.1

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing Sentencing Memorandum was served via CM/ECF on September 12, 2018, on all counsel of record on the service list.

/s/  Robert T. Watson
Robert T. Watson

KL3 3181583.1